# SMITH *v.* BURNETT.

APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT, OF
COLUMBIA.

No. 112. Argued January 6; 9, 1899. — Decided March 13, 1899.

Undoubtedly there was jurisdiction in admiralty in this case, in the courts below.

Although a wharfinger does not guarantee the safety of vessels coming to his wharves, he is bound to exercise reasonable diligence in ascertaining the conditions of the berths thereat, and, if there is any dangerous obstruction, to remove it, or to give due notice of its existence to vessels about to use the berths; at the same time the master is bound to use ordinary care, and cannot carelessly run into danger.

This court is unable to decide that the Court of Appeals of the District of Columbia was not justified in holding, on the evidence, that appellants were liable for negligence and want of reasonable care, and that the master was free from contributory negligence, and therefore affirms the decree of the Court of Appeals which agreed with the trial court on the facts.

THIS was an appeal from the Court of Appeals for the District of Columbia affirming a decree of the Supreme Court of the District, sitting in admiralty, whereby appellees, original libellants in the cause, were awarded damages, and a cross libel filed by appellants was dismissed. 10 D. C. App. 469. As stated by the Court of Appeals, the libel was filed by appellees against appellants for an alleged injury to their vessel, the schooner Ellen Tobin, while moored in berth at appellants' wharf on the bank of the Potomac at Georgetown, for the purpose of being loaded by and for appellants; and the injury complained of was averred to have been occasioned by appellants negligently allowing a dangerous rock to remain in the bed of the river within the limits of the berth at the wharf, which the vessel was invited to take, the obstruction being unknown to the master of the vessel, and he having been moreover assured by appellants through their agent that the depth of water in the berth in front of the wharf was sufficient and that the berth was safe for the loading of the vessel.

The facts, in general, found by that court were: That appellants were lessees of wharf and water rights extending to the channel of the river, and the berth assigned to and taken by the schooner for the purpose of loading was in front of their wharf and within the leased premises; that appellants were engaged in the business of crushing and shipping stone from the wharf to different points; and that the schooner had been brought up the river by prearrangement with a ship broker in Georgetown in order to be loaded by appellants at their wharf with crushed stone to be taken to Fortress Monroe, in Virginia, to be used in government work at that place. That the vessel was stanch and in good repair; was a three masted schooner of six hundred tons capacity; was registered at the New York custom house as a coasting vessel of the United States, and was owned by appellees at the time of the injury complained of. It was further found "that the vessel was sunk on [Sunday,] the 6th of August, 1893, as she was moored in the berth at the wharf, while receiving her cargo of crushed stone from the wharf, by means of a chute extended from the wharf to the hatchway of the vessel. The vessel

was about two thirds loaded, having received about four hundred tons of her cargo, before signs were discovered of her distressed condition. She was then taking water so rapidly that the pumps could not relieve her, nor could the extra assistance employed by the master avail to save her from breaking and sinking in the berth. The work of loading was stopped on Saturday evening, with the intention of resuming the work of loading on the following Monday morning; and the captain of the vessel, at the time of stopping work on Saturday, made soundings around the vessel and supposed that she was then lying all right. But on Sunday morning it was discovered that there was so much water in her that she could not be relieved by her pumps; and by 5 o'clock on the afternoon of that day she had filled with water, and broke in the middle, and sank in her berth, where she remained, with her cargo under water, until the 1st of November, 1893, when the stone was pumped out of her, and she was then condemned as worthless, and was afterwards sold at auction for $25 to one of the owners." Other findings of fact appeared in the opinion.

Appellants denied all negligence, and insisted that they were in no way responsible for the disaster; and in a cross libel asserted a claim for damages caused by the fault of appellees in allowing the vessel to sink in the river in front of their wharf and to remain there for an undue time. The evidence was voluminous and conflicting.

*Mr. R. D. Benedict* for appellants. *Mr. James S. Edwards*, *Mr. Job Barnard* and *Mr. Nathaniel Wilson* were on his brief.

*Mr. William G. Choate* for appellees.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

Undoubtedly there was jurisdiction in admiralty in the courts below, and the applicable principles of law are familiar.

Although a wharfinger does not guarantee the safety of vessels coming to his wharves, he is bound to exercise reasonable diligence in ascertaining the condition of the berths thereat, and if there is any dangerous obstruction to remove it, or to give due notice of its existence to vessels about to use the berths. At the same time the master is bound to use ordinary care, and cannot carelessly run into danger. *Philadelphia, Wilmington &c. Railroad* v. *Philadelphia &c. Steam Towboat Co.*, 23 How. 209;. *Sawyer* v. *Oakman*, 7 Blatchford, 290; *Thompson* v. *N. E. R. R. Company*, 2 B. & S. 106; *S. C.* Exch. (1860,) 119; *Mersey Docks Trustees* v. *Gibbs*, L. R. 1 H. L. 93; *Carleton* v. *Franconia Iron and Steel Company*, 99 Mass. 216; *Nickerson* v. *Tirrell*, 127 Mass. 236; *Barber* v. *Abendroth*, 102 N. Y. 406.

*Carleton* v. *Franconia Iron and Steel Company*, 99 Mass. 216, is so much in point that we quote from it, as did the Court of Appeals. The case was in tort for injury to plaintiffs' schooner by being sunk and bilged in the dock adjoining defendants' wharf which fronted on navigable waters, where the tide ebbed and flowed. Defendants had dredged out the adjoining space to accommodate vessels which were accustomed to come with iron and coal for defendants' foundries, situated on the wharf. There was in the space dredged a large rock, sunk in the water and thereby concealed from sight, dangerous to vessels, and so situated that a vessel of the draft to which the water at the wharf was adapted, being placed at high water at that part of the wharf, would lie over the rock, and at the ebb of the tide would rest upon it. Defendants had notice of the existence and position of the rock and of its danger to vessels, but neglected to buoy or mark it or to give any notice of it to plaintiffs or any one in their employment, though their vessel came to the wharf by defendants' procurement, bringing a cargo of iron for them under a verbal charter. Mr. Justice Gray, among other things, observed:

"It does not indeed appear that the defendants owned the soil of the dock in which the rock was embedded; but they had excavated the dock for the purpose of accommodating vessels bringing cargoes to their wharf; and such vessels were

accustomed to occupy it, and could not discharge at that point of the wharf without doing so. . . . Even if the wharf was not public but private, and the defendants had no title in the dock, and the concealed and dangerous obstacle was not created by them or by any human agency, they were still responsible for an injury occasioned by it to a vessel which they had induced for their own benefit to come to the wharf, and which, without negligence on the part of its owners or their agents or servants, was put in a place apparently adapted to its reception, but known by the defendants to be unsafe. This case cannot be distinguished in principle from that of the owner of land adjoining a highway, who, knowing that there was a large rock or a deep pit between the travelled part of the highway and his own gate, should tell a carrier, bringing goods to his house at night, to drive in, without warning him of the defect, and who would be equally liable for an injury sustained in acting upon his invitation, whether he did or did not own the soil under the highway."

And as to the degree of care required of the master or vessel owner, the same court in *Nickerson* v. *Tirrell* rightly said : " The true rule was stated to the jury, that the master was bound to use ordinary care, and could not carelessly run into danger. We cannot say, as matter of law, that he was negligent because he did not examine or measure the dock and berth. It was for the jury to determine whether the conduct and conversation of the defendant excused the master from making any more particular examination than he did make, and whether, upon all the evidence, he used such care as men of ordinary prudence would use under the same circumstances."

The cases necessarily vary with the circumstances. In *The Stroma*, 42 Fed. Rep. 922, the libellant sought to recover damages received by its steamer, while moored alongside respondent's pier, by settling, with the fall of the tide, on the point of a spindle, part of a derrick attached to a sunken dredge. Work was proceeding for the removal of the dredge, and several buoys had been set to indicate the place of its several parts. The agent of the steamer knew of the location of the wreck;

sought permission to moor outside of it; and undertook to put the ship in position. The liability to danger was as well known to the steamer as to the wharfinger, who made no representation and was free from negligence. The libel was dismissed, and the decree was affirmed by this court. *Panama Railroad Company* v. *Napier Shipping Company,* 166 U. S. 280.

In *The Moorcock,* 13 P. D. 157, defendants, who were wharfingers, agreed with plaintiff for a consideration to allow him to discharge his vessel at their jetty which extended into the river Thames, where the vessel would necessarily ground at the ebb of the tide. The vessel sustained injury from the uneven condition of the bed of the river adjoining the jetty. Defendants had no control over the bed, and had taken no steps to ascertain whether it was or was not a safe place for the vessel to lie upon. It was held that, though there was no warranty, and no express representation, there was an implied undertaking by defendants that they had taken reasonable care to ascertain that the bottom of the river at the jetty was not in a condition to cause danger to a vessel, and that they were liable. The judgment was sustained in the Court of Appeal, 14 P. D. 64, and was approved by the House of Lords in *The Calliope,* (1891) App. Cas. 11, though in the latter case it was ruled, on the facts, that there was no sufficient evidence of any breach of duty on the part of the wharfingers, and that the injury to the vessel was caused by the captain and pilot attempting to berth her at a time of the tide when it was not safe. The berth was in itself safe, but it was held that, under the particular circumstances disclosed by the proofs, the ship owner had assumed as to the approaches the risk of reaching the berth; while the general rule in respect of the duty of wharfingers was not questioned. The Lord Chancellor remarked: " In this case the wharfinger, who happens to be the consignee, invites the vessel to a particular place to unload. If, as it is said, to his knowledge the place for unloading was improper and likely to injure the vessel, he certainly ought to have adopted one of these alternatives: either he ought not to have invited the

vessel or he ought to have informed the vessel what the con-
dition of things was when she was invited, so that the injury
might have been avoided." Lord Watson: "I do not doubt
that there is a duty incumbent upon wharfingers in the posi-
tion of the appellants towards vessels which they invite to
use their berthage for the purpose of loading from or unload-
ing upon their wharf; they are in a position to see, and are in
my opinion bound to use reasonable diligence in ascertaining
whether the berths themselves and the approaches to them
are in an ordinary condition of safety for vessels coming to
and lying at the wharf. If the approach to the berth is im-
peded by an unusual obstruction they must either remove it,
or, if that cannot be done, they must give due notice of it to
ships coming there to use their quay." And Lord Herschell:
"I do not for a moment deny that there is a duty on the part
of the owner of the wharf to those whom he invites to come
alongside that wharf, and a duty in which the condition of
the bed of the river adjoining that wharf may be involved.
But in the present case we are not dealing, as were the
learned judges in the cases which have been cited to us, with
the condition of the bed of the river in itself dangerous —
that is to say, which is such as necessarily to involve danger
to a vessel coming to use a wharf in the ordinary way; and
we are not dealing with a case of what I may call an abnor-
mal obstruction in the river — the existence of some foreign
substance or some condition not arising from the ordinary
course of navigation."

We are remitted then to the consideration of the facts, and
as to them the rule is firmly established that successive de-
cisions of two courts in the same case, on questions of fact,
are not to be reversed, unless clearly shown to be errone-
ous. *Towson* v. *Moore*, 173 U. S. 17; *The Baltimore*, 8 Wall.
377, 382; *The S. B. Wheeler*, 20 Wall. 385, 386; *The Rich-
mond*, 103 U. S. 540. And when the evidence is conflicting,
there being evidence to sustain the decree, this court will not
ordinarily interfere.

Tested by this rule we must assume on the record that the
vessel in question was chartered by appellants, through a ship

broker duly authorized, for the purpose of being loaded with a cargo of crushed stone, which would be about six hundred tons, by appellants at their wharf, to be discharged at Fortress Monroe; that the contract, which was oral, did not expressly name the number of tons to be loaded, nor guarantee the depth of water, nor the position of the vessel at the wharf, nor embody as part thereof the representations alleged to have been made in respect of the depth of the water; that there was a ridge of rock in the berth assigned to the vessel by appellants, projecting above the bottom of the river and endangering her safety, even when only partially loaded; and that the vessel, though stanch, strong and seaworthy, was wrecked by grounding on that rock.

We also think that the conclusions of the Court of Appeals, set forth in its opinion, that no ordinary skill or effort on the part of the master or owners could have been exercised effectively to save the vessel from total loss, and that the injury was not increased, nor the damages enhanced, by delay in attempting to raise and remove the vessel, cannot reasonably be questioned; and that we are not required to pass on the conflicting evidence in respect of the value of the vessel at the time of the injury. In other words, it must be held that the cross libel was properly dismissed, and that the amount of damages awarded is not open to inquiry.

As to knowledge or notice of the obstruction by appellants, the evidence tended to show that they had been for some years in the use of the wharf and of this particular berth; that they had under lease perhaps two and a half miles of river front, containing stone quarries, some of which they were working; that their business was large, and that during the year 1893, before the accident, they had loaded from fifteen to twenty vessels at the same place; that the capacity of the crusher for loading vessels through the chute was from one hundred and fifty to two hundred tons a day; that they employed from one hundred and fifty to three hundred men, and at times many more, and had bins into which they ran crushed stone to be carried off in various ways. It further appeared that in December, 1892, the two masted schooner

Baird, carrying five hundred tons, and when loaded drawing fourteen feet, grounded in the same berth, manifestly on a rock, and that that fact and the character of her injuries were known to appellants. There was much other evidence bearing on this point of knowledge or notice, which fully sustained the Court of Appeals in its conclusion that appellants knew of the existence of the rock, and its dangerous nature; or, if not, that absence of investigation amounted, under the circumstances, to such negligence as to impute notice.

But the stress of the argument is that the master was guilty of negligence which contributed to the injury, and chiefly in not ascertaining the condition of the bottom of the berth and taking precautions, as advised. Yet on this, as on other branches of the case, the evidence was conflicting, and we cannot say that the finding of the Court of Appeals that the evidence failed to establish "that there was want of due care on the part of the master, and a failure to exercise proper supervision for the safety of the vessel, while she was moored at the wharf for the purpose of being loaded," was clearly erroneous. The master came to the berth on appellants' business; and there was evidence to the effect that the broker, with whom the engagement was made, and appellants' foreman were both informed that the vessel would draw when loaded from fourteen to fourteen and one half feet, and that the master was assured by both that there was plenty of water; that the berth had been dredged out to between fourteen and fifteen feet; and that there was fourteen feet "sure at low water." The evidence also tended to show that the foreman suggested on Friday to the master to make some soundings for himself; that there might have been something dropped over from a lighter that he did not know of; that the captain did make soundings and found sufficient water as the vessel then lay; that one of the appellants told the foreman "to tell the captain of the Tobin that he had better sound around the vessel and make sure that it was laying all right;" that the foreman "said the vessel was laying all right, but he would tell the captain," as he afterwards reported he had; that the captain sounded around the vessel on Saturday

and discovered no dangerous condition; that the vessel did not commence leaking until Sunday morning; and that the master thereupon did all he could to save her. It does not appear that the master was informed that the bottom was a rock bottom, or that the fact was mentioned that the Baird had previously got on an obstruction in the berth; and there was nothing in what was said to lead the captain to suppose that there was danger provided there was water enough around the vessel. He rather thought the vessel touched bottom on Saturday evening at low tide, but that, if so, did not in itself constitute cause for alarm. In fact, the danger was the existence of the rock in the middle of the berth under the vessel. The evidence is voluminous in respect of the extent and manner of the loading; of what passed between the parties; of the different soundings, and so on; but it is unnecessary to recapitulate it, as we are satisfied that no adequate ground exists for disturbing the result reached.

At all events, we are unable to decide that the Court of Appeals was not justified in holding on the evidence that appellants were liable for negligence and the want of reasonable care, and that the master was free from contributory negligence; and the decree must, therefore, be

*Affirmed.*