CONKLIN et al. v. R. P. & J. H. STAATS CO.

(Circuit Court of Appeals, Third Circuit. May 18, 1908.)

No. 24.

Wharves—Sunken Piles—Injury to Scow at Unfinished Pier—Negligence of Contractor.

Respondent, as contractor, was constructing the piers of a steamship company at Hoboken to replace others which had burned, and had contracted with libelant to furnish crushed stone delivered on scows. The new piers were not in the same place as the old, and respondent had removed all stubs of the old piles extending above low water, while an independent contractor had dredged the bottom, and supposedly removed all those below. By agreement libelant left scows loaded with stone which was to be used by respondent during the winter, and respondent caused one of them to be removed from one side of a slip to the other, and there tied up to one of the new piers, where others were also made fast. A strong wind from the west caused an unusual fall of the tide, and as such scow settled she was pierced by the stub of an old pile and injured. The place alongside the pier had been used during the work with safety, and respondent had caused it to be dragged for obstructions. *Held*, that the liability of respondent was not that of a wharf owner, the piers being unfinished and not in commercial use, but that its duty was only to exercise due care, and that under the facts shown it did not fail in such duty and was not liable for the injury, which was chargeable to an accident not reasonably to be anticipated.

Appeal from the District Court of the United States for the District of New Jersey.

For opinion below, see 155 Fed. 818.

Walter L. McDermott, for appellants.

Robert E. Hudspeth and Merritt Lane, for appellee.

Before DALLAS, GRAY, and BUFFINGTON, Circuit Judges.

BUFFINGTON, Circuit Judge. In the court below the appellants, Conklin and others, filed a libel against the R. P. & J. H. Staats Company, a corporation, to recover damages to their scow Sarah. On final hearing the court dismissed the libel. Its opinion is reported in 155 Fed. 818, where the facts are fully stated. Thereupon the libelant took this appeal.

The Staats Company was engaged in rebuilding piers of the North German Company at Hoboken, which had been destroyed by fire. It was a large undertaking, and took six years, from 1900 onward, for its completion. The fire destroyed the superstructure and left the stumps of piles standing. Such piles as showed above water were removed by the Staats Company, but the dredging and removal of the stumps below low water was done by a third company. The piers were relocated and were being constructed by the Staats Company at the time of the injury complained of. In such reconstruction they had been for some time furnished by the libelant with scow loads of broken stone. On December 13, 1901, the Staats Company wrote libelant as follows:

"Confirming our conversation to-day with reference to the delivery to us of several scow loads of broken stone for use in our work at Hoboken during

the winter, we understand that you will send us five scow loads of such stone, containing about 3,000 cubic yards in all, and will deliver the same alongside the North German Lloyd docks at Hoboken within the next few days, allowing them to remain there during the winter months; also that we may use the stone from these scows as occasion requires, without charge for demurrage to us until such time as a scow is taken from the lot for our use, and demurrage shall only accrue on that scow after sufficient time has elapsed in which to unload the scow at a minimum rate of 75 yards per day (Sundays and holidays excepted). The scows while lying in the slip to be solely at your risk, and you will provide such men as may be needed to look after them, and when a scow shall have been unloaded by us you will remove it from the premises."

In accordance therewith the Sarah, with four other scows laden with stone, was towed to the north side of pier No. 2 on December 29, 1901, where she lay until January 3, 1902, when the Staats Company desired her space to bring in a barge of other material, and requested the tug of the North German Lloyd Company, which did the towing for all parties, to remove her. During this interval the scows were treated as undelivered, for two of them were removed by libelants and others substituted for them without consulting the Staats Company, and there was no proof to show that in requesting the removal of the Sarah the Staats Company directed at what point she should be moored, or accepted her in any such way as under the foregoing letter thereafter subjected itself to demurrage. The tug moved the scow to the south side of pier No. 1, where she was tied by the scow's crew. The tide was then ebbing rapidly, aided by a strong westerly wind, which had been blowing for two days, and which caused the tide at the time of the accident to drop from 18 to 24 inches lower than usual. Pier No. 1 was then being constructed by the Staats Company. On its south side and at some distance therefrom there was piling extending parallel to the pier and through an opening in which the scow, as well as other craft, were warped to moor along the pier. What followed is stated in this extract from the opinion of the court below:

"The scow was moored on the south side of pier 1, breast off five feet, and was tied with two breast and two spring lines. The tide was ebbing rapidly, aided by a strong westerly wind, which had been blowing for two days, and which had caused the tide at the time of the accident to fall from 18 inches to 2 feet lower than usual. After the scow had laid at her mooring about three-quarters of an hour, she began to list away from the pier. Her captain sounded the water around her with a 16-foot pole, to see if the water were shallow; but he found no bottom. He then went down into the hold and heard water beginning to trickle slowly in. While he waited on the scow a pile broke through her bottom, and she careened over gradually to the port side. He then went up the pier to look for help, and when he came back, a few minutes later, the scow lay bottom up, with one corner on the pier and the other in the water. He tried to ease up the lines to see if she would slide off, but she did not. While she lay there, the watchman says he saw a jagged hole in her bottom, 16 or 17 inches wide by about 2 feet in length. The hole was about one-third of her length from the bow, and about 2 feet from her starboard side, which had lain next to the pier. Subsequent examination of the scow at a dry dock, to which she was taken for repairs, showed that the injury to her was in all probability caused by her bottom coming in contact with a sunken pile, which, owing to the weight of her load, was forced through and rammed up in her hold as far as it could go, about 9 feet, and then, when the scow capsized by the spilling of its load, was broken off, and a piece thereof, about 8 feet in length, left in her hold in a reclining posi-

tion between the stanchions and cross-pieces. The portion of the pile found in the scow was a little less than 15 inches in diameter, about 9 feet long, and was in good condition, although it had a few barnacles on it. At one end appeared what is called a 'battered break,' as though a heavy weight had rested on it. This break had an old appearance, while at the other end was a new and longer break. It is apparent from the evidence that the accident happened by reason of the fact that the scow had been moored over a hidden pile: but how or when the pile came there is not disclosed."

Assuming, for present purposes, the responsibility of mooring the scow is on the Staats Company, is it responsible for the damage it suffered? Of the duty of wharf owners to "exercise reasonable diligence in ascertaining the condition of the berths thereat, and if there is any dangerous obstruction to remove it, or to give due notice of its existence to vessels about to use the berths," there is no question. Smith v. Burnett, 173 U. S. 430, 19 Sup. Ct. 442, 43 L. Ed. 756. But we think the standard of duty owing by the Staats Company was, under the circumstances, not exactly that required of a wharf owner in the usual course. This wharf was not in commercial use. It was unfinished. It and its surroundings were being used for construction purposes. A great fire had occurred. Piles were burned to the water's edge. Others below the surface had been dredged for. The location of the piers had been changed. All these were elements of danger, which were incident to this reconstruction work, and to which any one who used his craft in participating in such work would expect to subject them. When, for his own profit, the owner of such craft saw fit to use his vessels in forwarding such reconstruction, it is manifest he could not expect from the builder who was reconstructing the same measure of safety he could from one whose wharf was finished and held out as a safe place in which to moor. Clearly the obligation of the Staats Company to the libelant was simply one of due care under the circumstances. That the Staats Company was not guilty of willful lack of care is clear. A competent dredge company had dredged the site of this pier, and for from 25 to 40 feet along its sides, to the depth of 25 feet. Third parties, as well as the Staats Company, were using their boats in about these piers, and the latter subjected libelant's boats to no greater risks than its own. There was nothing to suggest to the Staats Company as prudent and careful men the exitsence of this submerged pile. The place had been dredged by a competent dredging company in a manner to give reasonable assurance that it was clear of such obstructions. In the hidden nature of such unknown obstructions there could be no absolute assurance of their nonexistence. The failure of an experienced dredging company to find them in going over the ground by sections, and then going over it in the same way in return, was well calculated to reasonably assure both the Staats Company and the libelant that the bottom was free from piles. In addition to the test of actual dredging to which the ground was thus subjected, drag tests of the ground certainly to a depth of 10 feet had been made. While the low water that caused the accident was not of such character to be classed as extraordinary, yet it certainly was out of the usual stage. The conditions and dangers incident to this work would naturally challenge the notice of the libelant as forcibly as they would that of the Staats Company, and in the nature of things

they could not expect that the Staats Company could or would be expected to provide them wharfage, hedged and safeguarded by the same standards the law would exact from a regular wharfinger; for the work of the Staats Company was in effect notice that the wharf was not a finished one or in shape for general commercial use. All these are elements to be considered in determining whether, under the circumstances in which libelant and the Staats Company were placed, there was an absence of due care on the part of the latter toward the libelant.

We find no such lack of care, but the mishap was evidently one of those accidents that occur by an unavoidable combination of unanticipated factors, and which the care called for by the circumstances did not prevent. The court below has found the Staats Company was not negligent. The Supreme Court of New Jersey in a trial of this controversy was of the same opinion, and nonsuited the plaintiff, and its judgment was affirmed by the Court of Errors and Appeals. Conklin v. Staats, 70 N. J. Law, 771, 59 Atl. 144. While those decisions are not binding, they are persuasive, and support the conclusion we have reached.

The decree of the court below is affirmed.