## KENNY et al. v. BALBACH SMELTING & REFINING CO.

(District Court, S. D. New York. April 27, 1923.)

1. Wharves ⊂⊃20(3) — Wharfinger receiving goods consigned to himself under same duty to exercise care and skill as wharfinger maintaining wharf for wharfage only.

A wharfinger, who maintains a wharf on which to receive goods consigned to himself, is under same duty to exercise care and skill, according to circumstances, in giving boats which deliver cargo at his wharf a safe berth, as is a wharfinger who maintains a wharf only for purpose of collecting wharfage.

2. Wharves ⊂⊃20(7)—Evidence held to show obstruction upsetting scow was submerged pile.

Where scow, awaiting her turn to unload at wharf, settled with falling tide, apparently striking an obstruction, dumped her cargo, and turned over, bottom up, evidence *held* to show obstruction was a submerged pile, standing straight up 3 or 4 feet outside bulkhead, 2 feet from bottom, as claimed by libelant.

Affirmed 6 F.(2d) 672.

Macklin, Brown & Van Wyck, and H. L. Cheyney, all of New York City, for libelants.

Watson, Harrington & Sheppard, Walter C. Sheppard and Ralph O. Willguss, all of New York City, for respondent.

WARD, Circuit Judge. August 20, 1918, at about 6:30 a. m., at high water, the deck scow Kaolin, belonging to the libelant Kenny, with a cargo of slag consigned to the respondent, made fast with her starboard side alongside the respondent's bulkhead at Newark Bay, waiting her turn to be unloaded at the respondent's hopper. When the tide fell, she settled on an obstruction within 3 or 4 feet of the face of the bulkhead and began to leak. The captain went below and saw water spouting into the hold, and then went to respondent's office to report. While he was there the scow listed to port, dumped her cargo, and turned over, bottom up. She was 100 feet long, 30 feet beam, and 9 feet high. This libel was filed to recover dam-

age to the scow, and also the value of the captain's effects, who was a colibelant.

The libelant Kenny arrived at the place about 3 p. m. of the day of the accident, and he and the captain felt with a pike pole the top of a pile. The next day he and the captain and a diver made another investigation. The captain, taking off his clothes, went down and found a pile standing straight up about 2 feet from the bottom. The diver confirmed this. About a month after the accident the libelant Kenny sent Merritt & Chapman's launch with a diver and seven men, who found a pile standing straight up, about 3 or 4 feet outside of the bulkhead, to which they fastened a line and broke it off, bringing up a piece 9 feet long, which at the time of the trial was at the libelant's back yard, a photograph of it being put in evidence.

[1] We are not concerned in this case with a simple consignee, but with a wharfinger who is also a consignee. A wharfinger, who maintains a wharf on which to receive goods consigned to himself, as the respondent did in this case, is under exactly the same duty to exercise care and skill, according to the circumstances, in giving boats which deliver cargo at his wharf a safe berth, as is a wharfinger who maintains a wharf only for the purpose of collecting wharfage. The case of Conklin v. Staats, 161 F. 897, 88 C. C. A. 593, involved a wharf which had been destroyed by fire and was being reconstructed, and not used commercially at all. The decision depended upon its very exceptional circumstances, as did the decision in Panama R. Co. v. Napier Shipping Co., 166 U. S. 280, 17 S. Ct. 572, 41 L. Ed. 1004.

[2] It cannot admit of doubt that the scow settled with the falling tide on an obstruction which did pierce her bottom and broke three substantial planks running athwartship. To do this it must have been firmly in the ground and standing perpendicularly, as the libelant's witnesses testify. The respondent attributes the damage to two water-logged caps, which it discovered some days after the accident, lying in the mud at a very slight angle above the bottom. The fact that these caps were not discovered in a previous examination in the latter part of May, and were lying at this angle, convinces me that they could not have pierced the bottom of the scow, because in settling down on them she would simply have pressed them further into the mud.

The pile in question was discovered by the owner and the captain of the scow the day she capsized, was located by the captain and a diver going under the water the next day, and was broken off by the Merritt & Chapman launch about a month later, as testified to, among other witnesses, by Winfield, who came from the New York department of docks, and Mayhew, who came from the United States engineer's office.

Against such evidence the circumstances that the original wharf and reconstructed bulkhead may have been of oak, while some of the witnesses say the pile in question was spruce, and others pine; that some three months before the bottom had been swept for a copper kettle and for copper ingots that had fallen overboard, without discovering it; that two water-logged caps were found after the accident, without discovering it; and that there never had been a complaint by boats of an obstruction before— are entitled to little weight.

The libelants may take the usual interlocutory decree.