## THE NEPTUNE.
## THE MARIE TURECAMO.

### C. F. HARMS CO. v. B. TURECAMO CONTRACTING CO.

#### No. 11221.

District Court, E. D. New York.

Dec. 29, 1930.

Macklin, Brown, Lenahan & Speer, of New York City (J. Dudley Eggleston, of New York City, of counsel), for libelant.

Single & Single, of New York City (Thomas H. Middleton, of New York City, of counsel), for claimant.

William F. Purdy, of New York City, for respondent.

CAMPBELL, District Judge.

This suit is brought by the libelant to recover for damage alleged to have been caused to the deck scow Neptune, by grounding at the dock of the respondent, B. Turecamo Contracting Company, to which she had been towed by the steamtug Marie Turecamo.

On conflicting testimony, I find the facts as follows:

At all the times hereinafter mentioned, the libelant was and still is a corporation duly organized and existing under and by virtue of the laws of the state of New York, and managing owner of the deck scow Neptune, which up to the time of the happening hereinafter referred to was tight, staunch, strong, and in every respect seaworthy.

The steamtug Marie Turecamo was at the commencement of this suit, or during the pendency of process hereunder, within this district and within the jurisdiction of this court, and this court has jurisdiction.

The respondent B. Turecamo Contracting Company at all the times hereinafter mentioned was and now is a corporation organized and existing under and by virtue of the laws of the state of New York, with an office and place of business within this district and within the jurisdiction of this court, engaged in the business of handling building materials, and owner and/or lessee in control of a dock known as the B. Turecamo Dock, located at the foot of Twenty-Fourth avenue, Gravesend Bay, Brooklyn, N. Y.

On the afternoon of August 16, 1928, the steamtug Marie Turecamo picked up the scow Neptune, loaded with sand, at Pier 7, Staten Island, and with another scow, New York Trap Rock Westley Belle, loaded with stone, towed them to respondent B. Turecamo Contracting Company's dock, at Twenty-Fourth avenue, Gravesend Bay, Brooklyn, N. Y.

That dock was between 500 and 600 feet long, and at about 6:20 o'clock p. m., on a flood tide, the steamtug Marie Turecamo landed the scows Neptune and Westley Belle on the end of the pier. The Westley Belle got a line out and the Marie Turecamo let go the hawser and got back with her bow and pushed the boats around the end of the pier to the north side, so that the Neptune lay along the pier and about 250 feet in from the outer end of the pier, and the Westley Belle was alongside the north side of the pier near the outer end of the pier.

There was plenty of water in these berths for the Neptune and Westley Belle, and that

was the customary berth in which to leave scows at that dock.

The captain of the Neptune made no complaint as to the method of berthing them, and did not ask the master of the steamtug Marie Turecamo to take the Neptune back to Pier 7, Staten Island.

The delivery of the scows was accepted by B. Turecamo Contracting Company, the respondent, through Mr. Matteiello, its yard superintendent.

On the orders of said Matteiello, the steamtug Marie Turecamo tied up alongside the Westley Belle, and about 7 o'clock p. m., the master of the Marie Turecamo went home.

Later that evening, about 7:30 o'clock p. m., the respondent B. Turecamo Contracting Company, through its yard superintendent, on the rise of the tide, caused the Neptune to be pulled in by the usual method to a berth alongside the north side of said pier, further inshore, so that she would be in a position for the unloading of her cargo into one of the nine so-called silos on said dock, used for sand; that is, the one nearest the shore end of the dock.

The method pursued in moving in the Neptune was that the captain of the boat handed a line to the men in respondent's employ, which they hooked onto a crane owned and operated by the respondent, which pulled the scow in to the position shown in the diagram made by Mr. Mayhew, to show the sounding made by him. The captain of the Neptune handed the lines to the respondent's men, who put them on cleats on the dock, and he made them fast on the boat.

The captain of the Neptune made no request to have any cargo taken off, or to lighten his boat.

The lines as placed had plenty of slack to allow for the falling tide, and respondent's representative did not, nor did any of its men, give any warning to the captain of the Neptune other than to watch his line.

The respondent B. Turecamo Contracting Company does not work on that dock at night, and Mr. Matteiello, when the Neptune was tied up, left for home.

The steamtug Marie Turecamo took no part in moving in the Neptune from a position about 250 feet in from the end of the pier.

Later, about 9:30 o'clock p. m., the captain of the Neptune sounded with a pipe pole, at a few places on the ends and on the outside of the said scow, and found that she would be aground at low water, but did not find any lump.

On August 16, 1928, the tide was high at Governors Island at 9:55 o'clock a. m., and at 10:04 o'clock p. m., Daylight Saving time, and the tide was low on August 17, 1928, at 4:29 o'clock a. m., and was high at 10:49 o'clock p. m.

On August 16, 1928, it was high water at Sandy Hook at 9:29 o'clock p. m., Daylight Saving time, and low water at 3:53 o'clock a. m. on August 17th.

This was the first and only time that the captain of the Neptune had been at that dock.

About 11 o'clock p. m. the Neptune started to ground and started to leak, her seams opened up, she twisted, and the timbers started to crack. Under these conditions, there was nothing the Neptune could do, and she had to lie there until the next morning when she was unloaded. While she was in that berth the captain reported the damage, to the respondent's office on the dock, and the yard superintendent for the respondent looked over the Neptune and noticed that she was damaged. After about two days, when the Neptune was light, she was towed to the Jersey City Dry Dock.

She sustained no damages other than those caused by the grounding.

On November 4, 1928, Mr. Price, a surveyor employed by the United States Engineers, took soundings at Turecamo's Dock, at the berth which had been occupied by the Neptune on August 16, 1928, and in which she had been damaged, and found a hard lump formed of stones, gravel, or deposits of that sort, which lump was a competent producing cause for the twisting and damaging of the boat. On January 5, 1929, Mr. Mayhew, a United States Engineer, assisted by Mr. Hansen, also a United States Engineer, took soundings at Turecamo's Dock at the berth which had been occupied by the Neptune on August 16, 1928, and in which she had been damaged, and did not find the hard lump which had been found by Mr. Price, but found a sandy, fine gravel, firm bottom, that was fairly even.

The yard superintendent of the respondent B. Turecamo Contracting Company says that soundings were taken every week or two, but no records thereof were kept, and that the bottom was a sandy bottom, and was kept pretty even, as the soundings were taken so that it might scoop up whatever fell over in discharging boats. There is no evidence to show that the lump had not been scooped up between the times the soundings were made by Messrs. Price and Mayhew, respectively.

285

■ Upon the facts as found, it is apparent that the steamtug Marie Turecamo performed her towing service properly and landed the Neptune where directed by the consignee, in a safe berth on the north side of the dock, where the scow was properly tied up, and delivery was accepted on behalf of the respondent B. Turecamo Contracting Company, and the steamtug Marie Turecamo is without fault. The Stamford (D. C.) 35 F.(2d) 55; The Eastchester (C. C. A.) 20 F.(2d) 357; The Milton (C. C. A.) 235 F. 287. I have not overlooked the fact that the captain of the Neptune testified that the tug left the Neptune in the berth where she received the damage, but he is clearly in error, as the tug delivered the Neptune in the berth, about 250 feet in from the outer end of the pier, from which berth, without any assistance from the tug, the barge was pulled in by respondent's moving crane, to the berth where the injury was received.

It is undoubtedly true that the testimony of the captain of the Neptune was not entirely accurate as to the place he was first landed, or as to the participation of the tug in the later landing, but there is no doubt that the Neptune was damaged in the berth to which she was moved by respondent's representatives, after she had been safely landed by the tug where directed by the consignee, as the yard superintendent of the respondent testified that he saw damage to the knees when he looked over the boat still in the berth, on the next morning after the damage had been reported by the captain.

■ No citation of authority is necessary to show that vessels of this character are supposed to take ground at low tide, but that is on an even bottom, not on an uneven and lumpy one, which will cause a twist.

The testimony of the yard superintendent of the respondent B. Turecamo Contracting Company falls far short of showing that the Neptune was improperly constructed or unseaworthy.

Comment is made upon the fact that the captain made some soundings, and chose to leave his boat in the position in which she was, but the answer to that seems to be that his soundings were not made until an hour after his boat was put in the berth, and did not and could not disclose to him the lump which was underneath his boat, and he had no knowledge of the condition of any other berth. All that his soundings disclosed was that his boat would rest upon the bottom at low tide, and as I have found that vessels of this character are supposed to take ground at

low tide, damage should not have been anticipated if the bottom was even. C. F. Harms Co. v. Upper Hudson Stone Co. (C. C. A.) 234 F. 859.

The respondent B. Turecamo Contracting Company, the consignee, designated the berth and placed the Neptune therein, and was legally bound to provide a reasonably safe berth; therefore the sole question remaining is: Was the berth a reasonably safe one?

Both Messrs. Price and Mayhew are careful, competent men, whose testimony I accept as true, and in view of the fact that there is no evidence to show that there was no dredging done between the dates of their surveys, it may well be that the lump that was found by Mr. Price was removed thereafter and before Mr. Mayhew made his survey, and this would seem to be the fact because the yard superintendent of the respondent said that they sounded every week or two, and that when they are discharging a boat a little sand will fall over the side, and that is what they take the soundings for—to scoop that up again.

The berth was not reasonably safe, and because of the lump which made the bottom uneven, the Neptune was damaged.

I find as conclusions of law:

The steamtug Marie Turecamo delivered the Neptune at the berth designated by the consignee, which was a reasonably safe berth, where she was tied up and accepted by the consignee, and the said steamtug Marie Turecamo is without fault.

The respondent B. Turecamo Contracting Company was the owner or lessee and in control of the whole wharf and the consignee of the cargo of the Neptune, and legally bound to furnish her with a reasonably safe berth, and that it placed the said scow in a berth that was unsafe, without warning the captain of the scow of the nature of the berth, and that he was unable to ascertain the same by the soundings which he made, and that due to the unsafe character of the berth, the scow was damaged by grounding on an uneven bottom, at low tide, without any fault on the part of the libelant and the captain of the scow, and that the said respondent B. Turecamo Contracting Company was wholly at fault.

The libelant is entitled to a decree against the respondent B. Turecamo Contracting Company, with costs and the usual order of reference, and the steamtug Marie Turecamo to a dismissal of the libel, with costs against libelant.

A decree may be entered in favor of the libelant against the respondent B. Turecamo Contracting Company, with costs and the usual order of reference, and in favor of the steamtug Marie Turecamo, dismissing the libel, with costs against the libelant.

If this opinion is not considered to be a sufficient compliance with rule 46½ of the Rules in Admiralty (28 USCA § 723), findings of fact and conclusions of law may be submitted.