KENNY et al. v. VENETIAN CONTRACTING CO.

No. 12539.

District Court, E. D. New York.

May 31, 1932.

Purdy & Purdy, of New York City (Wm. F. Purdy and Frank C. Mason, both of New York City, of counsel), for libelants.

Macklin, Brown, Lenahan & Speer, of New York City (G. J. McKernan, of New York City, of counsel), for respondent.

INCH, District Judge.

Libelant owned the deck scow Bermudez. On April 24, 1931, she was loaded with approximately 500 cubic yards of sand consigned to the respondent, which was also the owner of the dock at which the scow was to be unloaded.

This sand was placed on the Bermudez at a dock in the Raritan river. A tug then took her to Perth Amboy, where another tug took her to Newtown Creek, Long Island, and from there to the vicinity of Twenty-Sixth street, East River, arriving at this place on Saturday afternoon April 25, at 2 o'clock. She then lay there until early morning on the following Friday, May 1, when the tug Rugge towed her to the plant of the respondent located on the East River at the foot of Tiffany street, Bronx, N. Y., arriving there about 10 a. m.

By the usual contract the respondent had agreed to furnish a safe and suitable dock with sufficient depth of water at which the scow could be so unloaded.

The respondent was both the wharfinger and the consignee. Kenny v. Balbach, etc. (D. C.) 6 F.(2d) 671.

The respondent's duty was to use ordinary care to see that the berth into which the scow was placed was reasonably safe and free from anything that would be dangerous to the scow, or, at least, give due notice to libelant or the master of the scow of the existence of such dangers so that they might be avoided. Smith v. Burnett, 173 U. S. 430, 19 S. Ct. 442, 43 L. Ed. 756; M. & J. Tracy v. Marks, etc. (C. C. A.) 283 F. 100; C. F. Harms Co. v. Turecamo, etc. (D. C.) 49 F.(2d) 283; The Eastchester (C. C. A.) 20 F.(2d) 357.

The Bermudez was a deck scow, 112 feet long, 33 feet wide, 10 feet sides, with rake bow and stern. She could accommodate more sand but carried substantially a full load. Her master Waden was on board.

Respondent unloaded scows at this dock by means of a crane or digger which operated on a short track running at right angles to the face of the dock. There was no side movement of the crane permitted along the dock. Boats were brought in to a point in front of this crane.

When the tug brought the Bermudez to this dock, her master talked with an employee of the respondent's who was present with his helper and the former told the master where to make fast, the helper assisting with the lines. The scow was made fast where he was told to place her, which, apparently, was about in front of the crane.

The master had never been at this dock before. No one told him or libelant of any danger or that he should breast off the scow. It was then about high tide, and he and John Kenny, one of the executors of the estate owning the scow, and who had arrived at the dock about 15 minutes after the scow's arrival, sounded the bottom and measured the water around the scow and found it to be between 10½ and 11 feet in depth.

According to Kenny if the scow on the ebb tide dropped 6 feet she would be aground, and he accordingly was anxious, and so informed the representative of respondent, to have work commenced as soon as possible so that the scow might be unloaded and lightened when that time came.

Accordingly, shortly thereafter Kenny measured the load of sand, and after this had been done and about 11:45 a. m. he left the place. Kenny says that some one of the Venetian Company helped him measure the load. Ganzi, who testified for the respondent, and who was on the dock when the scow came in, being in charge for the respondent of incoming boats, testified that Kenny measured it with the master of the scow; that, "I told him I would take his word."

However this may be, after the load had been measured, Kenny left and the master went into his cabin. The scow had arrived and was up to that time in all ways seaworthy and not leaking.

Later, that afternoon, while the master was sitting in his cabin reading he heard a cracking sound, he immediately went down into the hold of the scow, and there he saw some "stringers coming from the bottom." He returned to the dock and called the engineer of respondent's and together they went down and "looked it over."

Apparently the man referred to by the witness was Ganzi, who testified that: "About half past one the captain came up and told me his scow had been damaged. I went with him down inside of the scow, he went first with a search-light and I followed. He showed me some split timber on the side. We were down there about 10 minutes. The captain told me he was going to call up his boss."

There is some dispute as to what happened thereafter, but this much is plain that

the master did go up to the office where Ganzi called him a "faker" and said that there was nothing broken. He thereupon left the office and called up the Kennys.

Ganzi, when called by respondent, testified to accompanying the master down into the scow and says all he saw was some "split timber on the side"; that he told the master that there was "nothing broken"; yet if respondent's theory is to be believed all the very plain damage shown by the subsequent survey was present as it had, according to respondent, been sustained by the scow before she reached the dock.

The two Kennys, John, whose testimony has previously been referred to, and James, arrived at the plant that same evening and both of them testified that they saw the damage to the bottom of the scow.

John says that he saw that the scow had apparently come down on what he terms a boulder to such an extent that "it broke the stanchion right up and it split the stringer overhead."

James Kenny testified that he found the stringers "pushed up into the boat about 5 inches, the bottom stringers were split, the stringers on the deck above were pushed up."

All the eyewitnesses for libelant to this condition of the scow mention this particular form of injury and that it was about 31 feet from the stern of the scow. They also mention the fact that the scow had somewhat of a twist so as to affect the closing of the cabin door and had a list from the dock.

John Kenny then took an axe and went over on to the dock and "cut a notch in the stringpiece opposite this injury to the bottom of the scow," stating that he "knew that the boulder was about 8 feet out from that stringpiece and about 31 feet from the open hatch of the scow. That he did this for a marker."

After the scow was loaded and she was taken to drydock for survey which occurred a few days thereafter, all the witnesses seem to agree that about 8 or 10 feet in from the side of the scow there was a diamond-shaped impression which had damaged the bottom of the scow. The experts for the libelant testified that this indicated to them that the scow had rested on something which had pushed up the bottom plank and thus caused the injury.

To be sure there were other scoring and damage found, as might be expected in a scow engaged in this sort of work, but the exact extent of the damage is not at the present time the question to be decided. Whether or not the damage resulting approximately from this cause as claimed has been exaggerated must be decided later.

The question requiring decision now is whether there was any damage done to libelant's scow by reason of a neglect on the part of respondent to use reasonable care in regard to this berth at which it placed the scow.

It may seem that quite an unnecessary amount of testimony has been taken in regard to this question, due perhaps to the desire of the court to allow the respondent to present its defense to the fullest extent.

Libelant claims that its scow was damaged by being allowed to rest upon a boulder or rock at this place in front of the crane and that the presence of this boulder was not only dangerous, as was shown by what happened to the scow, but rendered the berth unsafe and was a violation of the duty resting on respondent.

The respondent claims that there was no such boulder or rock, that its berth was level and safe, and that the damage done to the scow had been caused by the tug dragging the scow over a ledge of rock some distance away from the dock of the respondent.

[2] The burden rested upon libelant to prove, by a fair preponderance of evidence, that the berth was unsafe and that this was the proximate cause of the injury to its scow.

In my opinion libelant has made out a prima facie case.

While respondent was not an insurer, it was obliged to use due care, and accordingly it was its "duty to know the character of the bottom, and to see that boats coming there should be adequately informed of any and all dangers." C. F. Harms Co. v. Upper Hudson, etc., 234 F. 859, 860 (C. C. A. 2d).

According to this record neither the libelant nor the master had previously sent a scow or been with it at this wharf. Nor was there any indication at this wharf or warning given of any such obstruction at the place where respondent directed the scow to be placed and assisted in tying her up.

"The master had a right to assume that the berth was clear of stones." Peterson v. Great Neck, etc. (D. C.) 75 F. 683, 684 (Benedict, D. J.).

In the last-mentioned case the proof showed that the master had knowledge of the conditions and had been notified which facts are not present here, for the contention is

that there was no obstruction and none proved which was the situation before the court in McQuilkin v. Delaware, etc. (D. C.) 184 F. 698, 699.

Having proved the above facts as to the location of its scow, etc., libelant showed that when the tide fell and the scow rested upon the bottom that some obstruction, it claims a rock or boulder, damaged the bottom of the scow, pushing up the timbers where the weight of the scow had rested upon it.

The fact that there was this imprint and localized damage about the place where libelant claims seems conclusively shown, and in fact respondent's proof seems to me to be rather that such imprint and damage, while existing yet was caused by a rock at some other place for which respondent would not be liable.

Libelant likewise proved that the presence of this obstruction became known to the master of the scow indirectly by his discovering that it was doing damage to the bottom of his boat. That he immediately brought it to the attention of the respondent and also notified his employer who, upon arrival within a few hours, examined the bottom of the scow from the inside, and found the conditions to be as the master claimed.

If, therefore, there existed at this place a rock or boulder or similar obstruction of such character as to so damage the bottom of the scow, the berth was unsafe and respondent was required to use reasonable care to ascertain, before placing a scow at this point, whether or not there was such an obstruction and show by credible testimony that it had examined or had made reasonable efforts to ascertain whether such obstruction existed.

Libelant proved sufficiently the existence of an obstruction which would indicate negligence unless adequately explained.

So far as libelant's own duty is concerned, it apparently exercised reasonable care and did not rely solely on the placing of the boat at this place by respondent. Soundings were made around the boat which indicated no danger and a request was made to proceed to unload her expeditiously so that she might not be too heavy when she rested on the bottom. As has been said: "it was generally known that at low tide loaded boats would take the bottom, the master of the tug [scow] did not know of this lump, and did not leave until the boat had been made fast in the place where the wharfinger's

agent directed." C. F. Harms Co. v. Upper Hudson (C. C. A.) 234 F. 859, 860. That there was ample water was shown by libelant's investigation. Libelant therefore was not careless.

This brings us to the explanation of respondent.

As we have said respondent claims that there was no such obstruction; that the damage appearing on the bottom of the scow had been caused shortly before she arrived through the negligence of the tug in charge by dragging the scow over a ledge of rock. In my opinion there is no such proof. Such an accident is denied by the master of the scow and by the tug captain, nor is the contrary shown except by speculation by witnesses for respondent.

The captain of the tug explained his maneuver which, in substance, was dropping the hawser by which he had towed the scow up the East River and taking her alongside and into the berth. This is what the witness for respondent Ganzi saw and which counsel for respondent argued was or could have been the dragging of the scow over the ledge of rock.

It seems to me that it is insufficient and not supported by adequate proof. I prefer to find that "as no other probable or adequate cause appears for the wound in the bottom of the boat * * * I must find it to have been caused by the boulder above referred to." Manhattan Transp. Co. v. New York (D. C.) 37 F. 160.

This brings me to the other testimony which tends to confirm my finding that the obstruction was in fact at the place claimed by libelant and had subsequently been found to be so by respondent. To be sure no witness for respondent makes any such admission, but it appears that promptly after the injury to libelant's scow was made known to it, respondent bought, for $200, an old scow, and placed her ready for use in front of the digger and proceeded to dig a large hole, by means of its crane, in the bottom of this berth at the place in question into which such rock or obstruction would naturally tumble and soon be covered over.

It must be remembered that this crane could not be moved sideways but would operate only in about the locality that libelant claims this obstruction was located.

Just why respondent should go to this expense and do this work promptly after notice of libelant's accident if it was not satisfied that such obstruction was present is

not clear. It is far more probable that upon their own subsequent examination they had discovered this obstruction and then proceeded to make the berth safe, in the meantime having the scow ready for further protection in case they were not able to dispose of the obstruction readily by means of the crane.

The subsequent survey of the entire section by respondent which was allowed to be shown becomes unimportant in view of the presence of the obstruction at the place claimed by libelant. Kenny v. Balbach, etc. (D. C.) 6 F.(2d) 671, 672.

The case of Tracy v. Marks (C. C. A.) 283 F. 100, 102 (C. C. A. 2d), was a suit where a consignee alone was concerned. Here the consignee was also a wharfinger.

In the Tracy Case the court held: "We may assume that there was this single boulder on an otherwise safe and soft bottom. The existence of that boulder was not only unknown to respondent but to the public. Vessels had continued to use this berth without finding this boulder almost to the day of this accident, and the repute of the wharf was good. It was upon this habit and reputation that the consignee acted, and we think he had a right so to act. Whether the city of New York, as a wharfinger, would have been held, had it been a party to this suit, is a matter as to which we are not called upon to express any opinion."

It may be argued that the mere presence of a boulder or an obstruction, beneath the surface, would not in itself be sufficient ground on which to base a finding of negligence. For that purpose respondent introduced testimony to show that other scows had been unloaded at this place without complaint and that the bottom generally was level and soft.

Aside from the indefinite character of some of this testimony, it must be remembered that respondent's main contention is that the injury to the scow was received before the scow arrived at its dock.

However, libelant need not rely on proof of a mere obstruction, for the evidence shows that respondent was constantly unloading various scows at this limited locality, scows loaded with stones, stone dust, sand, and materials of this character; Ganzi, its employee saying in reference to one of these: "We got part of it, stone, off of the other boat on the same track (crane track) about a week before."

It appears also that but a comparatively short while before respondent had unloaded by this crane and at this same place the equipment for an asphalt plant from a large railroad scow.

When this is considered, a reasonable source of this obstruction, encountered by libelant's scow, is found.

This situation being present and known to respondent, the duty rested upon it to use reasonable care to inspect the bottom in front of this crane from time to time and be reasonably sure that no obstruction was present or warn libelant of the danger. Respondent neglected this duty. There is no proof that any such inspection was made by respondent until after the accident now complained of and no warning given.

Such negligence was the proximate cause of the injury to libelant's scow.

Accordingly, libelant is entitled to a decree with costs and the usual reference.

If this opinion is not considered a sufficient compliance with the rule 46½ of the Rules in Admiralty (28 USCA § 723), findings of fact and conclusions of law in accordance herewith may be submitted.