THE MASCOT.

THE WILLIAM L. HOOPER.

CONNECTICUT FIRE INS. CO. v. SMITH & RICHARDS LUMBER CO., Inc.

EASTERN TRANSP. CO. v. COOPERATIVE G. L. F. SOIL BUILDING SERVICE. Inc., et al.

Nos. 8421, 8451.

District Court, D. New Jersey.

Aug. 14, 1939.

Hatch & Wolfe and Henry P. Elliott, all of New York City, for Connecticut Fire Ins. Co., Libellant, and Cooperative G. L. F. Soil Building Service, Inc., Respondent.

Foley & Martin and Christopher E. Heckman, all of New York City, for Eastern Transp. Co.

Douglas V. Aitken, of Bridgeton, N. J., and Howard M. Long, of Philadelphia, Pa., for Smith & Richards Lumber Co., Inc.

FORMAN, District Judge.

These two suits, consolidated for trial, arise out of the sinking of the barge, "William L. Hooper", in the Cohansey River, which occurred on November 23, 1936 at Bridgeton, New Jersey, off the dock of Smith & Richards Lumber Company. The "William L. Hooper" was laden with a cargo of fertilizer consigned to the Cooperative G. L. F. Soil Building Service, Inc., hereinafter referred to as the G. L. F. The Connecticut Fire Insurance Company, insurer of the cargo, has responded to G. L. F., and now sues in the first case, Admiralty 8421, as successor to its rights for damages to the cargo. In the second case, Admiralty 8451, the Eastern Transportation Company, owner of the barge, "William L. Hooper," instituted suit to recover for damage to its vessel and for unpaid freight.

In July of 1936 the G. L. F. orally agreed to pay Smith & Richards Lumber Company 10 cents a ton for each ton of fertilizer unloaded at the latter's dock on the Cohansey River. At the time of this agreement no inquiries or disclosures were made by either of the parties as to the physical character of the dock.

In September, 1936, the G. L. F. had decided to open a fertilizer plant at Bridge-

ton, N. J., and pursuant thereto it wrote the War Department of the United States Government requesting that the Cohansey River be dredged, since its maximum capacity at that time would be a cargo of approximately 250 tons.

On November 14, 1936 the G. L. F. chartered the "William L. Hooper" through Wathen & Company, shipbrokers of Baltimore, Maryland, for the purpose of transporting fertilizer from Baltimore to Bridgeton. The G. L. F. guaranteed in the following language sufficient water to keep the barge afloat: " * * * sufficient water for the barge to safely lie afloat at all times being guaranteed to, at and from the wharf or places of loading and discharging, * * *."

The "William L. Hooper" was loaded in Baltimore with over 700 gross tons of fertilizer. Before her departure her captain, Denwood W. Insley, who was familiar with the waters around Bridgeton, advised Mr. Olwine, now deceased, an officer of Eastern Transportation Company, that the barge would lie on the bottom at Bridgeton. To this, Olwine replied, "That is all right, go ahead."

The barge embarked from Baltimore bound for Bridgeton, N. J., being towed by the tug, "Hilton". At Poole's Island the tug, "Mascot", replaced the "Hilton", and from there she proceeded to Bridgeton. About twenty miles from her destination she hit bottom and rested until the incoming tide. This is not unusual, because barges frequently rest on the ground without damage providing the bottom is even.

The "William L. Hooper" arrived at the Smith & Richards Lumber Company's dock about 4:45 P. M., November 23, 1936, and no preparations had been made for her arrival. In fact, she was an unexpected surprise. Rufus S. Richards, president and general manager, and his assistant, James Rodman, were at the dock in behalf of Smith & Richards Lumber Company. The first indication of the arrival of the "William L. Hooper" was an exclamation by Rodman directed to Richards that "an ocean liner" was coming up the river.

Prior to this time the majority of vessels docking at this point were 75 to 125 feet in length carrying a cargo of approximately 300 tons. This barge was 186 feet long, and it will be recalled that her cargo was over 700 gross tons.

The only testimony disclosing Richards' knowledge of the physical character of his dock is meagre. He states that on September 7, 1936 he made soundings from the starboard side of the barge, "Edgar L. Williams", a self-propelled vessel about 123 feet in length, which was breasted off 6 feet from the bulkhead of the Smith & Richards Lumber Company's dock. These soundings were made at the bow, stern and amidships. Another sounding was made amidships on the port side. This is the limit of his knowledge, notwithstanding the fact that there was a flood in 1934 which to his knowledge carried away bridges and changed the character of the bottom of the river.

On the basis of this knowledge he indisputedly advised the captain of the barge how to approach the bulkhead and moor with safety. He admits he did not at that time know the draft of the barge, and adds that he considered only her length. What he advised is contradicted.

Richards testified that he told Captain Insley, the only man on the barge, to breast off approximately 20 feet from the dock, and put the bow out towards midstream. As soon as he satisfied himself that these instructions were being followed, he departed.

The barge actually docked parallel with the bulkhead breasted off approximately 15 feet, the stern of the boat extending beyond the property of Smith & Richards Lumber Company. The bottom of the river was uneven and elevated in the vicinity of the stern and bow of the barge. At low tide these ridges supported the ends of the barge, but permitted its center to sag causing the damage which ensued.

The captain of the barge and the crew of the tug, "Mascot", offered an entirely different story as to the directions Richards offered them. These witnesses testified that as the bow of the "William L. Hooper" approached it struck ground within 4 feet of the dock. The captain then made soundings with an improvised crab net pole about 12 feet in length which he ran along the starboard side two-thirds the length of the deck up from the stern. He also made one sounding on the port side. These witnesses are consistent in their testimony that Richards came upon the boat at this time and said there was a bar under the stern, and in order to avoid this bar he should breast off about 10 or 15 feet and she would be safe. The boat was actually moored in accordance with these alleged instructions.

From these facts the court will determine the respective liabilities of the parties herein, but before doing so it is pertinent at this point to consider what judicial guidance we have on the problem.

The following quotation from the case of M. & J. Tracy v. Marks Lissberger & Son, 2 Cir., 283 F. 100, is illuminating:

"The duty of a wharfinger is to exercise reasonable care in ascertaining the condition of the berths at his wharf and to remove dangerous obstructions or give due notice of the existence thereof to vessels about to use the berths. Smith v. Burnett, 173 U.S. 430, 19 S.Ct. 442, 43 L. Ed. 756. This means that a wharfinger is bound to ordinary care and diligence in the transaction of his business, and it is the duty of a libelant to prove negligence. Stevens v. Maritime, etc., Co. [2 Cir.], 263 F. 68. If the injurious obstruction, though concealed, might have been ascertained by the wharfinger through the exercise of reasonable diligence, liability exists. Manhattan, etc., Co. v. Mayor, etc., D.C., 37 F. 160. And even where the obstruction is known and the notice given, so that it cannot be understood, liability continues. Schoonmaker v. New York, 167 F. 975, 93 C.C.A. 227.

\* \* \* \* \* \*

"The consignee of a vessel is 'bound to provide a safe berth,' as has been often said (e. g. Bowen v. Decker, D.C., 18 F. 751), which phrase, however, means no more than that such consignee, while not guaranteeing the safety of the destinated wharf, 'is bound to exercise diligence in ascertaining the condition of the dock and of the berths, and to give notice of any obstruction or of any danger to vessels' (Look v. Portsmouth, etc., Ry., D.C., 141 F. 182). This, also, is an obligation to exercise due care according to the circumstances, and as against a consignee it is as necessary to prove negligence as it is against a wharfinger. There is no warranty or insurance in either instance. Yet a distinction has been suggested between the standard of duty required of a wharf owner and that of a consignee. Conklin v. R. P. & J. H. Staats Co., 161 F. 897, 899, 88 C.C.A. 593.

"The difference between the obligations of consignees and wharfingers does not rest upon any legal distinction that can be drawn between their respective 'standards of duty.' Both are bound to the exercise of care and diligence under the circumstances; but the means of ascertaining the existence of probable, or even possible, danger are not the same for both. In the majority of cases usually cited on this subject, the same person or corporation was at once wharfinger and consignee. In this case respondent's use of the city's wharf was an incident, as occasional an exercise of a citizen's right or privilege as is riding for hire in a city-owned omnibus or car. The duty rests upon the wharfinger to watch, maintain, and keep in order that which he asks the public to pay him for the use of. The consignee, and especially the occasional user, who is a consignee, is bound to acquaint himself with the reputation and commonly known characteristics of what the wharfinger offers for hire. But a consignee, who knows that a berth has a good reputation, that it has been used for years without complaint or known accident, is entitled to transact his business on that reputation." 283 F. 101, 102.

■ The law also exacts a duty of care from the bargee. He cannot knowingly intrude upon danger. In the cases of Morey v. City of New Rochelle, 2 Cir., 254 F. 425, and Leo v. McCollum, D.C., 107 F. 742, the bargeman was notified of dangerous obstructions at the dock. Failure to heed these warnings precluded recovery for damages to the barge which ensued.

As between wharfingers and charterers the courts have held that the wharfinger is primarily liable for injuries sustained by vessels at the dock, and that the charterer is secondarily liable. Constantine & Pickering S. S. Co. v. West India S. S. Co., D. C., 199 F. 964; Healey v. Moran Towing & Transportation Co., 2 Cir., 253 F. 334; The John Carroll, 2 Cir., 275 F. 302; Donovan v. Frederick Starr Contracting Co., D.C., 290 F. 501.

■ The situation herein is different from the cases heretofore cited in that the charterer, the G. L. F., has guaranteed that there would be "sufficient water for the barge to safely lie afloat at all times". Thus, it is unnecessary to deal with implications, because we have an express assurance which carries with it a corresponding extension of duty. See Crisp v. U. S. & Australasia S. S. Co., D.C., 124 F. 748; Merritt v. Sprague, D.C., 191 F. 627; Cities Service Transportation Co. v. Gulf Refining Co., 2 Cir., 79 F.2d 521. This in our opinion puts the charterer and

774

wharfinger on equal terms. Their duties correspond.

With the factual and legal background in mind we shall now determine whether or not the parties hereto have fulfilled their respective duties.

■■ The G. L. F. was totally unfamiliar with the physical condition of the wharf. Its reliance upon its good reputation was unwarranted, since the "William L. Hooper" was shown to be of larger proportions than those vessels out of which a reputation for safety arose. Notwithstanding this meagre knowledge, the G. L. F. expressly guaranteed sufficient water to safely float the barge. It has done nothing to qualify itself to make this guarantee. We think its dereliction in this respect is a contributing cause of the accident.

The Smith & Richards Lumber Company's duty could not have arisen prior to the time the "William L. Hooper" docked, because it did not expect the barge. Its duty accrued at the time its president and general manager, Rufus S. Richards, directed the mooring of the barge. His testimony reveals that he had made soundings about his wharf on only one occasion—September, 1936, prior to the damage incurred herein. At that time he made three soundings on the starboard side of the "Edgar Williams" at intervals of about 60 feet, and one sounding on the port side. The information derived from these soundings is patently insufficient to qualify him to give any directions whatsoever. Under the circumstances, we think he could exonerate himself only by an unequivocal disclosure that mooring at his wharf would be at the bargeman's risk. This he did not do, and Smith & Richards Lumber Company must respond for his neglect.

■ The Eastern Transportation Company is alleged to have contributed to the damage in two respects. First, it is contended that it knew before the barge embarked from Baltimore that she would not lie afloat in Bridgeton. We fail to see how this failure amounts to a wilfull intrusion upon danger. For this knowledge to constitute an assumption of risk it must be proved that Eastern Transportation Company knew that the barge would be damaged in the event she did not float, and that she would not lie afloat. This has not been proved.

■ Secondly, it is contended that the Eastern Transportation Company knew through its bargemaster at the time the "William L. Hooper" docked at Bridgeton that she was in a place of danger and should have made soundings to ascertain the extent of the danger. Nassau Sand & Gravel Co., Inc., v. Red Star Towing & Transportation Co., 2 Cir., 62 F.2d 356. We think the conduct of Richards at the dock relieved the bargeman of his duty to determine its physical character. Unfortunately, we do not know what Richards' exact instructions were or whether they were followed. It will be recalled that Richards testified that the barge was not moored in accordance with his instructions. On the other hand witnesses in behalf of the Eastern Transportation Company testified that the barge was moored in accordance therewith. The fact that Richards was unqualified to direct a vessel in mooring at his dock in any manner relieves us of the necessity of determining the credibility of the witnesses, and speculating as to whether any damage would have ensued if the boat had actually docked at this wharf in a different manner.

In the libel brought by the Connecticut Fire Insurance Company (G. L. F.) for damages to the cargo against Smith & Richards Lumber Co., Inc., the Tug, "Mascot", the barge, "William L. Hooper", and Eastern Transportation Company, we conclude that in so far as the Eastern Transportation Company and its vessels are concerned it is dismissed. The libel is sustained against Smith & Richards Lumber Company, but recovery is limited inasmuch as the libellant is equally responsible.

In the libel for damages to the vessel brought by Eastern Transportation Company against Cooperative G. L. F. Soil Building Service, Inc., and Smith & Richards Lumber Co., Inc., recovery is granted against the respondents, they being equally responsible.

■ Within the latter libel there is a separate cause for action against the Cooperative G. L. F. Soil Building Service, Inc., for unpaid freight. The respondent in reply to this claim does not demand contribution from the Smith & Richards Lumber Company. Therefore, under the pleadings before this court, the claim for freight is allowed against Cooperative G. L. F. Soil Building Service, Inc.