### NEW YORK CENT. R. CO. v. AMERICAN DOCK CO.

### AMERICAN DOCK CO. v. NEW YORK CENT. R. CO.

### The PELHAM.

### Nos. 131-8, 132-79.

United States District Court
S. D. New York.
July 2, 1947.

Frederick L. Wheeler, of New York City (James L. More and Gerald E. Dwyer, both of New York City, of counsel), for libelant.

Herman Goldman, of New York City (Harry G. Liese, of New York City, of counsel), for respondent American Dock Co.

COXE, District Judge.

These cross suits grow out of the sinking of the barge Pelham on September 28, 1941, in the slip between Piers 1 and 2 of the American Dock Company at Tompkinsville, Staten Island. The barge was at the time under charter to the New York Central Railroad Company, and sank as a result of coming into contact with a submerged pile while being towed out of the slip.

The libelant in the main suit is the New York Central Railroad Company, the charterer of the barge, and the libel seeks damages against the American Dock Company resulting from the sinking. In the cross suit the libelant is the American Dock

Company, and the damages asked are for negligently obstructing the slip during a short period after the sinking, and prior to the removal of the barge.

At the outset of the trial the libelant in the cross suit conceded that it would be unable to show any negligent obstruction of the slip by the Railroad Company, and no effort was made to do so. The cross suit may therefore be disregarded, leaving only for determination the single issue in the main suit, namely—whether the respondent Dock Company was negligent in failing to furnish a safe berth for the barge. In the subsequent discussion the Railroad Company will be referred to as "libelant" and the Dock Company as "respondent".

The facts are as follows:

On September 28, 1941, the respondent was in business as a wharfinger, and owned, operated and maintained Piers 1 and 2, and the slip between these piers, at Tompkinsville, Staten Island. On that date the Eugenie S. Embiricos was moored on the south side of Pier 1, bow in, with her stern a couple of hundred feet from the pier end, discharging a cargo of India ore to barges alongside. The south side of Pier 1 was 950 feet long; the north side of Pier 2, 970 feet long; the slip between the piers 150 feet wide; and the depth of water in the slip, 28 to 30 feet. Alongside the Embiricos was the barge Pelham, and outside the Pelham was the barge Ellis Soper. The Pelham was 118 feet long, 30.8 feet beam, and 12.6 feet deep; the Ellis Soper, 99.8 feet long, 27 feet beam, and 12.8 feet deep. Both barges lay bow in the slip and were heavily laden with India ore from the Embiricos. The Pelham had between 900 and 950 tons of this ore on board, and drew 11 feet 6 inches at the stern and 10 feet 4 inches at the bow.

At about 7:30 p. m. on the same date the tug New York Central No. 34 came into the slip between Piers 1 and 2 to tow the two barges to Weehawken, N. J. The tug No. 34 was 108 feet long, 26 feet beam, and had a depth of 13.3 feet. The tow was made up so that the tug could back out of the slip pulling the barges along stern first in tandem formation. This was accomplished by placing the Ellis Soper behind the Pelham and making the Ellis Soper the lead boat in the backing operation. The tug had a lead line from the tug's bow to the stern of the Ellis Soper, and there were short lines from the bow of the Ellis Soper to the stern of the Pelham.

As the tug started backing, the barges sagged towards Pier 2 and moved slowly along fairly close to the north side of that pier. After the tug cleared the end of Pier 2, and when the stern of the Ellis Soper was slightly beyond the pier end, the two barges stopped dead in the water and the tug brought up on its line to the Ellis Soper. The cause of the stoppage was a submerged pile, which crashed through the port stern corner of the Pelham, and despite prompt efforts to keep the barge afloat she sank in about half an hour.

On the day following the sinking, salvage operations were commenced, and it was found that the Pelham was resting deeply in the mud bottom "around 100 feet" from the end of Pier 2, with her stern "about 4 or 5 feet" from the north side of the pier and her bow "about 20 feet from the dock". The barge was raised on October 14, 1941, and a broken pile was found at an angle from the dock side penetrating through the port stern corner and lodged in the deck planking. The pile was broken at both ends, measured about 21 feet 6 inches in length and about 13 inches in average thickness, and was similar in material and appearance to the fender piling along the north side of Pier 2.

At the point where the barge sank, some of the pilings on the north side of Pier 2 were loose, some were broken, at least one fender piling was missing, and the dock itself was in a general state of disrepair. The respondent owned and maintained the north side of Pier 2 and the adjacent slip for a number of years prior to September 28, 1941, and last repaired the north side of the pier over thirteen months prior to the sinking of the Pelham. During this period of over thirteen months extensive use was made by the respondent of the slip and Piers 1 and 2, but there was at no time any under-water inspection of the berths and no sweeping of the slip to detect or remove obstructions. The pile which crashed through the port stern corner of the Pel-

ham was part of a broken submerged piling which at some time previously had been affixed to and a part of the respondent's property.

First.—The evidence is ample to support the finding already made that the pile which caused the sinking was not flotsam but part of a broken submerged pile which at some time previously had been affixed to and a part of the respondent's property. This evidence shows that the pile projected at an angle from the north side of Pier 2, that it was driven with great force into the port stern corner of the Pelham, and that the port stern corner of the barge was at the time of impact only about 4 or 5 feet from the north side of Pier 2. This, together with the evidence regarding the condition of the north side of Pier 2 showing at least one fender pile missing, points irresistibly to a broken piling from the north side of Pier 2 as the cause of the sinking.

Second.—The duty of a general wharfinger to exercise reasonable diligence to provide a safe berth is well understood, and needs no comment. This requires the taking of reasonable precautions to remove under-water obstructions that might otherwise endanger the use of the berth. Berwind-White Coal Mining Co. v. City of New York, 2 Cir., 135 F.2d 443; Smith v. Burnett, 173 U.S. 430, 19 S.Ct. 442, 43' L. Ed. 756. Here the evidence shows that the respondent last repaired the north side of Pier 2 over thirteen months prior to the sinking of the Pelham, and that the respondent has since made extensive use of the slip and Piers 1 and 2. Yet, there was at no time during the period any under-water inspection of the berths and no sweeping of the slip to detect or remove under-water obstructions. In the face of this showing, and the general state of disrepair of the north side of Pier 2 at the time of the sinking, I do not think that the respondent exercised reasonable diligence to provide a safe berth for the barge.

There may be a decree in the main suit (No. A. 131-8) in favor of the libelant, New York Central Railroad Company, against the respondent, American Dock Company, for full damages, with costs; and in the cross suit (No. A. 132-79) in favor of the cross-respondent, New York Central Railroad Company, against the cross-libelant, American Dock Company, dismissing the cross libel, with costs.