REED & REED, INC., et al., Plaintiffs

v.

WEEKS MARINE, INC., Defendant

No. CIV.02–195–P–H.

United States District Court, D. Maine.

Sept. 2, 2004.

David J. Perkins, Patrick Jackson Mellor, Perkins Olson, P.A., Portland, ME, for Reed & Reed, Inc. and St. Paul Fire & Marine Insurance Company, Plaintiffs.

Leonard W. Langer, Tompkins, Clough, Hirshon & Langer, Portland, ME, for Weeks Marine, Inc., Defendant.

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW [1]

HORNBY, District Judge.

This case involves a dispute among subcontractors working on the construction of

---

1. The Findings of Fact and Conclusions of Law are amended to reflect judgment for the plaintiff St. Paul Fire & Marine Insurance Company, as well as the plaintiff Reed & Reed, Inc. See Section III. Conclusion at 26–27.

Bath Iron Works' Land–Level Transfer Facility project in 2000. The parties agree that the defendant's barge grounded out on underwater railways located on the plaintiff's property. They disagree, however, over who was at fault and over the extent of the damages. I presided at a bench trial in this case on June 7, 8, 9, 14 and August 12.[2] After considering the evidence and the arguments advanced by the parties, I make the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### (A) Background; Contractual Relationships

1. A land-level transfer facility enables shipbuilders to assemble and launch ships at land level, rather than launching them from inclined railways. Bath Iron Works ("BIW") began constructing its land-level transfer facility on the Kennebec River in Bath, Maine, in 1998.

2. The prime construction contract for the land-level transfer facility was between BIW and Clark Builders of Maine LLC ("Clark").

3. Clark entered into a subcontract with Atkinson Construction ("Atkinson") for various construction services. Atkinson, in turn, subcontracted work to Callahan Brothers ("Callahan") and the defendant, Weeks Marine, Inc. ("Weeks").

4. The plaintiff[3] Reed & Reed, Inc. ("Reed & Reed") is a general construction contractor, headquartered in Woolwich, Maine.

5. Reed & Reed owns a dockyard in Woolwich, Maine, on the easterly side of the Kennebec River.

6. Callahan is an affiliate of Reed & Reed. Reed & Reed and Callahan share owners, offices, and administrative staff. Reed & Reed created Callahan to pursue union work.

7. Atkinson and Callahan entered into a subcontract on August 11, 1998. Under the terms of that subcontract, Callahan agreed to manufacture eighteen concrete blocks or "grids," approximately 400 tons each. The concrete grids were designed to rest in the Kennebec River and support the dry dock at the land-level transfer facility.

8. The subcontract provided that Callahan would deliver the concrete grids either FOB the pier at Reed & Reed's Woolwich yard or FOB launched from marine railways at the Woolwich yard. At the time that Callahan and Atkinson entered into this subcontract, the parties had not determined how Callahan would deliver the grids.

9. Eventually, the parties decided that Callahan would launch the grids from marine railways, which had not yet been constructed.

10. On June 4, 1999, Callahan entered into a subcontract with Reed & Reed. Under the terms of this subcontract, Reed & Reed agreed to construct marine railways ("ways") at the Woolwich yard that Callahan would use to transport the landing grids from dry land into the Kennebec River. The subcontract between Callahan and Reed & Reed did not contain any specifications for how the ways should be built.

---

**2.** The nearly two month delay between the first and last days of trial was due to the unavailability of one witness (illness in his family) and intervening vacations.

**3.** St. Paul Fire & Maine Insurance Company ("St.Paul") is also a plaintiff in this lawsuit.

St. Paul is Reed & Reed's insurer and paid Reed & Reed's claim for the damages at issue in this lawsuit. St. Paul was granted intervenor plaintiff status because of its role as subrogee.

**114**

11. On August 1, 1999, Reed & Reed leased the Woolwich yard to Callahan so that Callahan could manufacture the grids at the yard and deliver the grids via the yard's ways.

12. Reed & Reed finished building the ways in the summer of 2000. The ways are similar to railroad tracks. They consist of two concrete structures (a "north way" and a "south way"), fifty feet apart, each with an iron channel on top, running from above the high tide area on dry land into the Kennebec River. A steel carriage sits on the iron channels and runs down the length of the ways into the river. To launch each concrete grid, Callahan placed the grid on the carriage and slid the carriage down the inclined ways into the river.

13. A triangular steel stop was at the underwater end of each way. The stops were designed to hold the carriage in place when it reached the end of the ways and to prevent the grid from sliding off the end of the ways into the Kennebec River. A rubber bumper was attached to the shore side of each stop. The bumpers were designed to absorb the shock of the 400–ton grid when it hit the stop.

14. On September 21, 1998, Atkinson entered into a subcontract with Weeks. Pursuant to a change order dated January 21, 2000, Weeks agreed to pick up the eighteen grids from the end of the Woolwich yard ways and to transport the grids across the river to the land-level transfer facility in Bath.

*(B) The Ways*

15. Weeks planned to pick up the grids from the end of the ways using a barge with a lifting frame on the stern (the end closest to the grid). It was therefore important for Weeks to know the as-built dimensions of the ways so that it could design a barge and lifting system that could get close enough to the grid to lift it without hitting the ways.

16. In September of 1999, Scitus Engineering, a firm working with Reed & Reed during the construction of the ways, prepared some preliminary drawings of the ways. One of these drawings showed that the distance between the outboard face of a launched grid, ready for pickup, and the end of the ways would be two feet. Thus, according to the Scitus Engineering drawing, the ways would extend two feet into the river beyond the point on the ways where the outboard face of the grid would be located when it was ready for pickup.

17. This drawing was provided to Weeks in the Spring of 2000, when Weeks began designing its barge and lifting mechanism.

18. John Karpinski, Weeks' project manager and the person responsible for designing the procedure for lifting and transporting the grids, relied on the two-foot distance in designing Weeks' barge and lifting system.

19. Weeks' final plans for the barge and lifting system are dated August 17, 2000.

20. On September 5, 2000, Scitus Engineering compiled a packet of drawings entitled "Construction Details: Landing Grid Transport & Support Structure." This signed and sealed packet contained drawings showing how Callahan would launch the grids. The packet also contained the same September, 1999, drawing, depicting the two-foot distance from the outboard face of the launched grid to the end of the ways. Weeks received this packet of drawings around September 7, 2000.

21. On August 31, 2000, Timothy Sanders, Callahan's senior project manager, called Karpinski and (contrary to the Scitus Engineering drawing calling out a two-foot distance between the face of the grid

and the end of the way) informed him that the north way actually extended approximately seven feet further into the river than the south way.

22. When Karpinski learned that the north way was longer than the south way, he sent Philip Sheridan, Atkinson's project engineer, an e-mail expressing concern that the length of the ways would interfere with the barge and lifting frame that he had designed. Karpinski wrote: "I do not want to float the barge over the way. The risk of damage to both is high.... At this late date, it appears that the ways have to be cut back ... to allow the barge to float up to the [grid] unobstructed." (Pls.' Ex. 32). In this e-mail, Karpinski acknowledged that floating the barge over the ways created a risk of damage to the ways. It was therefore foreseeable that the Weeks barge might damage Reed & Reed's property if allowed to float over the ways.

23. Sheridan delegated the task of resolving the way length issue to Bob Shufflebotham, Atkinson's head surveyor.

24. On September 5, 2000, Bill Saucier, a surveyor working for Reed & Reed, sent Atkinson "as built" scaled drawings of each way. Saucier's drawings depicted the stops with the rubber bumpers, 2'8" and 11" long, respectively, and showed that the north way was longer than the south way. Saucier's drawings therefore conflicted with the Scitus Engineering drawing showing that the ways extended only two feet beyond the outboard face of a launched grid.

25. Weeks claims that Atkinson did not pass along Saucier's as-built drawings and that Weeks did not see a copy of these drawings until after October 11, 2000.

26. Shortly after receiving Saucier's as-built drawings, Atkinson prepared its own scaled drawings depicting, in profile, the ways, the stops and bumpers, and the Weeks barge positioned to pick up a grid.

Atkinson shared these drawings with Weeks on September 11, 2000.

27. Like Saucier's as-built drawings, Atkinson's drawings showed the dimensions of the stops and bumpers at the end of each way. The drawings showed that each stop was 2'8" long, and that there was a bumper, approximately 11" long, attached to each stop. Thus, like Saucier's drawings, Atkinson's drawings contradicted the two-foot dimension reflected in the Scitus Engineering drawings.

28. When Weeks received Atkinson's drawings, Weeks learned that there were more than two feet between the outboard face of a launched grid, ready for pickup, and the end of the ways. Thus, regardless of whether Weeks received copies of Saucier's drawings, Weeks learned that the two-foot distance it had been relying upon in designing its barge and lifting frame was inaccurate.

29. Atkinson's drawings substantiated Karpinski's concerns. They illustrated that there would be interference between the stern of the barge that Weeks planned to use to pick up the grids and the end of the ways. The stops and bumpers together were actually 3'7" long and Weeks' lifting design was based on a 2' distance between the spot where the grid would be located for pickup and the end of the ways. Accordingly, the barge would have to float over both ways in order to get close enough to the grid to lift it.

30. Karpinski reviewed the scaled drawings provided by Atkinson, drew "cut" lines on the drawings, indicating that he wanted each way cut to accommodate Weeks' lifting method, and sent the drawings to Shufflebotham. Karpinski's notations showed that he wanted each way cut at such a point that the stops would be totally or partially removed.

31. On September 13, 2000, at Atkinson's direction, divers cut the end of the north way. They did not cut off the north way stop, but did cut a portion of a pile sitting underneath and supporting the end of the north way. The divers did not cut the south way.

32. Shufflebotham advised Karpinski that the divers did not cut the ways where Karpinski wanted them cut. Shufflebotham told Karpinski that the divers could not cut the north way on the shore side of the stop because, without the stop, there would be nothing to prevent the launched grids from going off the end of the ways. Shufflebotham also advised Karpinski that only the north way was cut. Karpinski was not happy, but he accepted the news.[4]

33. No as-built drawings of the ways were prepared after Atkinson cut the north way.

### (C) Weeks' Lifting Method

34. Weeks used a barge with a lifting device on the stern to permit the tide to lift the grids from the end of the ways so that the barge could then transport the grids to their destination.

35. Weeks and Atkinson considered several different designs for the barge and lifting frame. Before Atkinson subcontracted the task of lifting the grids to Weeks, Atkinson considered using a barge with a raked or angled stern. One of Weeks' design drawings, prepared after Weeks accepted responsibility for lifting and transporting the grids, showed a vertical beam running down the stern and extending below the bottom of the barge. The extended beam would have served as a "stop," allowing the barge to float right up to the end of the ways without floating over them. The extended beam was a safety measure to prevent the barge from floating over the end of the ways.

36. Weeks' preliminary drawings were circulated among Atkinson, Reed & Reed and Callahan at planning meetings throughout the summer of 2000.

37. Atkinson's Shufflebotham told Weeks that he was concerned that the extended beam on the stern of Weeks'

---

4. Karpinski testified that Shufflebotham never informed him that only the north way was cut. According to Karpinski, Shufflebotham told him that, after the divers cut the ways, there were eighteen inches between the end of the ways and where each grid would be located for pick-up by Weeks. Karpinski claims that, based upon this eighteen-inch representation, he believed that the barge would have plenty of clearance and would not float over the ways. Shufflebotham denies having told Karpinski that there were eighteen inches and claims that he told Karpinski that only the north way was cut and that the stop was not removed. For several reasons, I do not find Karpinski's testimony on this point credible. For one, Dan Mowers, who operated the Weeks barge, testified that, before the first grid was lifted, Karpinski told him that only the north way was cut. In addition, Karpinski testified that he marked the end of the ways with antennae before the first grid was lifted. If Karpinski marked the end of the ways, as he claims, he would have seen that there were approximately forty-two, not eighteen, inches between the face of the grid and the end of the ways. Given the disparity and the risk of damaging the ways, surely Karpinski would have spoken up and alerted Atkinson to the problem. Moreover, it is difficult to believe that Shufflebotham would have told Karpinski that there were only eighteen inches, knowing that there were actually forty-two inches, and knowing that Karpinski would discover the true distance at this first lift when he marked the end of the ways.

At trial, Weeks' lawyer introduced notes that Karpinski testified he took during the phone conversation where he claims Shufflebotham gave him the eighteen-inch dimension. (Def.'s Ex. 29). The note says "way cut back ... 18 [inches] end of way to face of" grid. I have studied the exhibit and do not believe that the notation was, in fact, made contemporaneously with the alleged phone call. The notes therefore have little probative value.

barge might damage the end of the way or get hung up on debris at the bottom of the river. Accordingly, Weeks agreed to change its design.

38. Weeks' final design drawings are dated August 17, 2000. These drawings were also circulated among the parties.

39. These final plans showed that the stern of the Weeks barge was square, rather than raked. Two vertical beams, 50 feet apart, ran vertically along the stern, ending flush with the bottom of the barge. Attached to the vertical beams were two cantilevered "strong arm" beams, also 50 feet apart.

40. For the first three grids, Callahan attached lifting straps or "slings" to the grids before it launched them and Weeks hooked the slings up to the strong arm beams when it arrived. For the fourth grid and thereafter, Weeks put the slings around each grid.

41. To lift each launched grid, Weeks positioned the lifting barge, Barge 298, in front of the grid and put the slings around the grid. Once the slings were hooked up to the grid, Weeks ballasted the bow of the barge and waited for the tide to come in to lift the barge and thereby the grid off of the ways.

42. Barge 298 had no independent power. Weeks relied on tug boats to move and hold Barge 298 in position. In order to position Barge 298 in front of the grid at the end of the ways, Weeks used spacer barges between Barge 298 and the Reed & Reed pier.

43. The spacer barges ensured that Barge 298 was lined up horizontally and held in position in front of the grid. However, the tug boats and the end of the ways themselves were the only method of controlling Barge 298's vertical (shore to middle of the river) movement. If Barge 298 approached the ways at low tide, the bottom of the barge was inches lower than the end of the ways. At low tide, therefore, the barge would touch the end of the ways and could not float over the ways.

44. Weeks' Method Statement provided that Weeks would arrive at the yard to position the barge and start hooking up the slings to the grid approximately two hours before low tide. The two-hour window was to give Weeks time to get the slings around the grid before the tide starting rising.

45. It is unclear whether arriving two hours before low tide also ensured that Barge 298 would be low enough in the water that it could be positioned against the end of the ways.[5]

46. Weeks picked up the first grid on September 19, 2000. On that day, the Weeks crew identified and marked the ends of the ways with antennae. The crew also drew paint lines on the Reed & Reed pier and on the spacer barge, representing where the ends of the ways were. The antennae later disappeared, but the paint lines remained.

---

5. Shufflebotham testified that the barge's vertical movement was controlled by approaching the ways when the tide was low and nudging the stern of the barge against the end of the way. According to Shufflebotham, the end of the ways themselves controlled the barge's movement and ensured that the barge did not get over the end of the ways. Roger Gagnon similarly testified that the only way to keep the barge in place was to push it against something. Karpinski, however, testified that he never intended to nudge the stern of the barge against the end of the way as a method of controlling the barge's vertical movement. Weeks' design drawings show that, at low tide, the bottom of the barge was lower than the end of the ways. Thus, at low tide, the barge could not float over the ways. It is impossible to tell from the drawings that the parties submitted (and the lawyers never elicited testimony about) whether the barge still would have nudged against the ends of the ways if it approached two hours *before* low tide, as called for in the Method Statement.

47. As long as Barge 298 did not cross the paint lines, it was not floating over the ways. However, according to Dan Mowers, Weeks' project superintendent who was on the site, Barge 298 had to cross the paint lines every time in order to reach the grids.

48. At several of the lifts, Weeks had to lower the stern of the barge in order to get the slings around the grid. To lower the stern, Weeks ballasted the barge by positioning a 500–ton crane on the stern and by pumping water into the stern.

49. While lifting the third grid, Weeks' barge came within inches of the grid itself. To prevent this from happening again and to protect the grids from damage, Weeks put a tire, 8–12 inches thick, on the face of each vertical beam on the barge stern. The tires acted as cushions between the barge and the concrete grid. Weeks used these tires for some of the following lifts, but not others.

50. Using the method described above, Weeks successfully lifted and transported the first eight 400–ton grids from the end of the ways across the river without incident.

### (D) The Incident: October 11, 2000

51. On October 11, 2000, Weeks arrived at the yard at approximately 1:30 p.m. to lift the ninth grid. On this day, Weeks arrived earlier than its Method Statement called for and earlier than it had in the past, approximately four hours and twenty minutes before low tide.

52. Once Barge 298 was positioned in front of the grid, Weeks began hooking up the slings to the grid as usual. Weeks was able to get one of the slings around the grid, but had a difficult time with the other sling.

53. Weeks began ballasting the barge heavily in order to lower the stern enough that Weeks could hook up the second sling.

54. Meanwhile, the tide was going out. As the tide went out, the barge, which was floating over the ways, came to rest on top of the ways.

55. At approximately 3:30 p.m., after two hours of Weeks' trying to hook up to the grid, there was a loud "bang." The "bang" was the sound of the north side of the barge slipping off the north way. After the noise, the north side of Barge 298 was approximately three feet lower in the water than the south side of the barge.

56. The tug reacted quickly and moved Barge 298 toward the middle of the river. The south side of the barge then came off of the south way and dropped three feet.

57. Immediately after the incident, the grid was tilted approximately four inches toward the middle of the river.

58. There was no evidence presented at trial that the grid was improperly positioned or not at the end of the ways and tight against the stop when Weeks arrived to pick it up on October 11, 2000.

59. Later that night, the Weeks crew hooked up to the grid and lifted it from the end of the ways.

60. The next day, on October 12, 2000, Reed & Reed pulled the carriage out of the water. The carriage was bent.

61. On October 13, 2000, Reed & Reed sent divers to inspect the ways and to assess the damage. The divers did a video survey, which showed large cracks in the concrete and damage to the stop on the north way.

62. Concerned that grids could no longer be safely launched from the ways, Reed & Reed halted the launching and lifting operations.

63. On October 18, 2000, Weeks' divers did some temporary repairs using epoxy underwater grout on the ways.

64. On October 19, 2000, Atkinson agreed to accept full responsibility for any damage or injury that might occur as a result of launching the remaining nine grids over the damaged portion of the ways.

65. As soon as Atkinson agreed to assume the risk of damage or injury, Reed & Reed permitted launching to resume.

66. Weeks picked up the tenth grid on October 19, 2000. The remaining grids were launched and lifted without incident.

67. Exactly how this underwater accident happened is unclear. Although the barge apparently could not float over the ways at low tide (because the end of the ways was higher than the bottom of the barge at its stern), there is no evidence that the end of the ways was higher than the stern two hours before low tide (the time that, according to Week's Method Statement, Weeks was supposed to arrive). If the end of the ways was, in fact, higher in the water than the stern two hours before low tide, then Weeks' early arrival on October 11, 2000 (when the tide was relatively high) is the reason that the barge was able to get over the ways. There is substantial evidence, however, that the barge floated over the ways every time it arrived to pick up a grid. Weeks drew paint lines on the pier and spacer barges to establish where the ends of the ways were. Karpinski testified that these paint lines were "do not cross" lines and that, as long as the barge did not cross the lines, it could not float over the ways. But Mowers testified that the barge crossed the paint lines (and so presumably floated

over the ways) every time it came in to pick up a grid. Moreover, when the Weeks barge arrived to pick up the third grid, the barge came within inches of the grid itself. In order to get that close to the grid, the barge had to have been over the ways.[6]

68. Despite the fact that the barge had to cross the paint lines every time, once came within inches of the grid, and was thus apparently floating over the ways, Weeks did nothing to ensure that the barge stayed off the ways. (According to Mowers, the tires that Weeks put on the stern after the barge came within inches of the grid were not intended to be "spacers," but rather to "cushion" the grid. Regardless, Weeks did not consistently use the tires and was not using them on October 11, 2000.)

69. On October 11, 2000, the Weeks barge floated over and then grounded out on the ways as the tide receded and as Weeks ballasted the stern. The barge damaged the ways themselves and was far enough up the ways that it also damaged one of the stops and the carriage upon which the grid was sitting.

### (E) Damages

70. Reed & Reed introduced testimony that the cost of repairs necessary to return the ways to their pre-October 11, 2000, condition is $374,797.

71. Reed & Reed's figure includes the cost of removing and replacing all of the concrete piles underneath the ways. I conclude, however, that there is insufficient evidence that the piles need to be replaced.[7]

---

**6.** I note that this would be true even if there were only eighteen inches between the face of the grid and the end of the ways, as Karpinski claims Shufflebotham represented. Assuming that a "few" inches is something less than eighteen inches, the barge would have been floating over the end of the ways on the day

that it came within eighteen inches of the grid regardless of whether the ways were as Karpinski claims Shufflebotham represented them.

**7.** The Salvage Association survey report, prepared shortly after the accident, suggests that

72. The following costs in Reed & Reed's figure are attributable to removing and replacing the piles: (1) $20,090 in labor; (2) $30,558 in materials; (3) $15, 235 in equipment; and (4) $10,814 in general conditions.[8] The total cost of removing

the piles must "be examined" to determine whether they need to be repaired. (Pls.' Ex. 45 at 3). In addition, Weeks' expert testified that there is no way to know whether the piles need to be replaced without examining them and/or conducting load bearing tests. It was undisputed at trial that nobody has inspected the piles or conducted load bearing tests to determine whether the piles were in fact damaged. Roger Gagnon, a surveyor for Reed & Reed, testified that he would not certify the ways for future use unless the piles were replaced. Gagnon, however, has never examined the piles since the accident. Gagnon also testified that the ways' elevation was measured before any grids were launched and again after the incident and that the measurements done after the October 11, 2000, incident showed that the ways had dropped two to three inches. There was no evidence, however, that the three-inch drop in elevation somehow made the ways unsafe or unfit for Reed & Reed's intended use of them. The burden of proving damages rests with Reed & Reed. I am not persuaded that the piles need to be replaced.

8. Reed & Reed's damage estimate is broken down into categories on a spreadsheet. (Pls.' Ex. 60). Sanders, who prepared the spreadsheet, identified certain costs associated with replacing the piles that could be backed out of the estimate in the event the piles did not need to be replaced. Sanders testified that, if the piles were not replaced, the estimate could be reduced $20,090 for labor, $30,558 for materials, and $15,307 for equipment. There is a fourth costs category on the spreadsheet, "general conditions," which, according to the spreadsheet, includes such items as supervisory labor, phone, electricity, insurance, and room and board for out of town crewmembers. Sanders testified that, although the "general conditions" category would also be reduced if the piles were not replaced, he could not estimate what that decrease would be. One of Weeks' witnesses, David Hafner, similarly testified about what the repair costs would be if the piles were not replaced. Reed & Reed objected to Hafner's testimony at trial on the ground that it constituted expert testimony and that Weeks had failed to designate Hafner as an expert. I admitted the testimony *de bene* and now conclude that, to the extent that Hafner merely

made arithmetical calculations based on the Sanders methodology in backing certain costs out of the total estimate, Hafner's testimony is admissible. Hafner agreed with Sanders that $20,090 and $30,558 could be subtracted from the estimate for labor and materials, respectively. Hafner assigned a cost of $37,839 to pile-related equipment. How he arrived at this figure is, however, unclear. Sanders testified that the diesel hammer would be unnecessary if the piles were not replaced. According to Reed & Reed's spreadsheet, the cost of the diesel hammer is $13,248, plus 15% for overhead and profit. Accordingly, the proper pile-related equipment figure is $15,235. (Sanders testified that the pile-related equipment came to $15,307, rather than $15, 235. The figures are close enough to be explained by mathematical error.) To the extent that Hafner included other pile-related pieces of equipment in his calculation, his testimony constitutes expert testimony and is inadmissible since Weeks failed to designate Hafner as an expert. Hafner also supplied a formula for calculating the portion of the "general conditions" category attributable to removing and replacing the piles. Because Hafner's testimony on this point is inadmissible expert testimony, I do not rely upon it. I do conclude, however, that some portion of the general conditions costs, attributable to the piles, should be backed out of Reed & Reed's estimate. According to the spreadsheet, the total estimated number of hours needed for repairs (including replacing the piles) is 3,126. According to Sanders' testimony, 644 of these hours are associated with removing the piles. Thus, Reed & Reed anticipated that removing and replacing the piles would account for approximately 20.6% of the overall labor hours. I recognize that not all of the items listed under "general conditions" would be reduced by 20.6% if the piles are not removed and replaced; some may be reduced more, others may not be affected at all. Neither of the parties suggested a more accurate way of assessing how much of the general condition costs would be saved if the piles are not removed and replaced, however. According to the spreadsheet, Reed & Reed anticipated general conditions to total $52,496. Based on the ratio that piling labor hours bear to the overall hours, I conclude that 20.6%, or

and replacing the piles, as reflected in Reed & Reed's figure, is $76,697.

73. The remainder of the costs included in Reed & Reed's estimate is reasonable.[9]

74. The cost of returning the ways to their pre-October 11, 2000, condition is $298,100 (Reed & Reed's estimate, less the costs associated with removing and replacing the piles).

## II. Conclusions of Law

1. Federal maritime law applies to maritime torts.[10] *See Carey v. Bahama Cruise Lines*, 864 F.2d 201, 208 (1st Cir. 1988); *Doucette v. Vincent*, 194 F.2d 834, 841–42 (1st Cir.1952); *Butler v. American Trawler Co.*, 707 F.Supp. 29, 31 (D.Me. 1989).

2. A tort is a maritime tort if: (1) the alleged negligence occurred on or in navigable waters; and (2) the alleged wrong bears a significant relationship or "nexus" to traditional maritime activity. *Carey*, 864 F.2d at 207 n. 4.

3. Reed & Reed alleges that, as a result of Weeks' negligence, Weeks' barge damaged its underwater ways while in the process of attempting to lift a grid to be transported across the Kennebec River and installed as part of the land-level transfer facility. The incident occurred in navigable waters. Reed & Reed has alleged a maritime tort.[11]

### (A) Weeks' Liability

4. "The analysis of a maritime tort is guided by general principles of negligence law." *Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir.1987). To establish maritime negligence, Reed & Reed must "demonstrate that there was a duty owed by [Weeks] to [Reed & Reed], breach of that duty, injury sustained by [Reed & Reed], and a causal

---

$10,814, of the general conditions costs are attributable to the piles and are therefore not recoverable.

9. Weeks argues that several of Reed & Reed's estimated costs are unreasonable or unnecessary. For example, Weeks faults Reed & Reed for including the cost of housing employees, for including more concrete than necessary to repair the ways, for repairing sixteen feet, rather than twelve feet, of the ways, and for including the cost of two coffer dams rather than one large coffer dam. Hafner testified about how much Reed & Reed's estimate should be reduced to account for these expenses. Hafner's testimony that Reed & Reed's concrete estimate is inflated constitutes expert testimony and is therefore inadmissible. *See* note 7. Similarly inadmissible as expert testimony is Hafner's testimony that Reed & Reed could repair the ways using only one coffer dam. Although Hafner's testimony about what it would cost to repair twelve, rather than sixteen linear feet of the ways, is admissible, there is no evidence that only twelve feet were damaged. (The Salvage Association reported that a total of eighteen feet was damaged and Sanders testified that his estimate was based on sixteen feet). Weeks suggested at trial that Reed & Reed could use local employees to repair the ways, eliminating housing costs. However, Reed & Reed is not obligated to repair its own ways and is entitled to recover the amount that it would have to pay another contractor to do the job. No evidence was introduced that a constructor could do the job with only local employees, making the housing costs unnecessary.

10. Although Reed & Reed's Amended Complaint invokes federal jurisdiction on the basis of diversity of citizenship, selection of diversity jurisdiction, rather than admiralty jurisdiction, does not determine what substantive law applies to the case. *Carey v. Bahama Cruise Lines*, 864 F.2d 201, 207 (1st Cir.1988); *Butler v. Amer. Trawler Co.*, 707 F.Supp. 29, 31 (D.Me.1989).

11. In Count II of its Second Amended Complaint, Reed & Reed also alleges that Weeks breached an implied contract to operate its barge in a safe and reasonable manner. In his closing argument, Reed & Reed's lawyer said that Reed & Reed was no longer pursuing the implied contract claim.

connection between [Weeks'] conduct and [Reed & Reed's] injury."[12]

5. Reed & Reed argues that Weeks was negligent both in operating and in designing its barge.

### (1) Operation

6. Because it was foreseeable that Weeks' barge might damage the ways if permitted to float over them, Weeks owed Reed & Reed a duty of reasonable care to ensure that its barge did not float over the ways.

7. Weeks did not exercise due care to keep the barge off the ways on October 11, 2000. Weeks therefore breached its duty to Reed & Reed.

8. Weeks' breach caused the damage to the ways.

### (2) Design

■ 9. In designing its barge and lifting mechanism, it was reasonable, and not negligent, for Weeks to rely upon the two-foot dimensions contained in Scitus Engineering's signed and sealed drawings.

10. Once Weeks learned that the two-foot dimension was inaccurate, however, Weeks had an obligation to address the disparity. Weeks' request that Atkinson cut the ways to accommodate its design satisfied Weeks' obligation at this point.

■ 11. A vessel owner is "bound to use ordinary care, and [may] not carelessly run into danger." *Smith v. Burnett,* 173 U.S. 430, 434, 19 S.Ct. 442, 43 L.Ed. 756 (1899). When Weeks learned that Atkinson was unable to cut the ways where Karpinski wanted them cut, Weeks had a

duty of reasonable care to ensure that it could safely lift the grids given the actual condition of the ends of the ways.

12. It is undisputed that Weeks was able to lift the first eight grids from the end of the ways without incident. This fact suggests that Weeks' design was compatible with the actual condition of the ways.

13. Undoubtedly, the Weeks barge could have been designed to minimize the risk of contact with the ways. I conclude, however, that Weeks' operational negligence superceded any design negligence. Weeks' negligent operation of the barge caused the accident on October 11, 2000.

### (B) Contribution / Allocation

■ 14. In its answer to Reed & Reed's complaint, Weeks asserted cross-claims against Atkinson for negligence, breach of contract and contribution/indemnity. Weeks claimed that Atkinson's failure to pass on critical information about the condition of the ways caused the accident.

15. Atkinson, in turn, filed a third-party complaint against Callahan, asserting negligence, breach of contract and contribution/indemnity. Reed & Reed then amended its complaint to assert negligence and breach of contract claims against Atkinson.

16. Atkinson and Reed & Reed reached a settlement agreement in the amount of $75,000. Shortly thereafter, on May 14, 2004, Atkinson filed a stipulation of dismissal between itself and Callahan.

---

**12.** Under maritime law, there is a presumption of negligence when a moving vessel collides with an obvious, or well-charted, stationary object. *E.g., Puerto Rico Ports Authority v. M/V Manhattan Prince,* 897 F.2d 1, 7–8 (1st Cir.1990) (presumption appropriate where vessel struck a pier); *Bangor & Aroostook Railroad Co. v. The Ship Fernview,* 455 F.Supp. 1043, 1054 (D.Me.1978) (pier). Reed & Reed has not argued that the presumption applies in this case. Moreover, the cases applying the presumption all deal with visible stationary objects such as piers or anchored vessels, not underwater structures like the ways at issue here. Accordingly, I do not apply the presumption in this case.

On June 1, 2004, Atkinson and Reed & Reed, and Atkinson and Weeks filed stipulations of dismissal, removing Atkinson from the case altogether.

17. Weeks maintains that, to the extent any judgment is entered against it, the judgment should be reduced either by the amount attributable to Atkinson's negligence or by $75,000, the settlement amount.

18. I have already concluded that maritime law applies. Under maritime law, "when two or more parties have contributed by their fault to cause property damage in a maritime collision ..., liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault ...." *United States v. Reliable Transfer*, 421 U.S. 397, 411, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). Thus, under maritime law, the damages are to be allocated according to each party's degree of fault. There is no authority under maritime law for crediting Weeks with the amount that Atkinson paid in the settlement.

19. Weeks argues that Atkinson's negligence was the cause or a contributing cause of the October 11, 2000, incident. Weeks faults Atkinson for failing to share Saucier's as-built drawings of the ways and for affirmatively representing that there were eighteen inches between the face of the grid and the end of the ways.

20. I have found as facts, however, that Weeks knew the actual condition of the end of the ways (making Atkinson's alleged failure to pass on Saucier's drawing irrelevant) and that Shufflebotham never told Karpinski that there would be eighteen inches between the face of the grid and the end of the ways.[13] *See supra*, Finding of Fact, ¶ 28, and note 3.

21. Atkinson's conduct did not cause the October 11, 2000, accident and Weeks is not entitled to contribution.

### (C) Contributory Negligence Defense

22. As the owner of a pier and underwater ways being used by Weeks, Reed & Reed's role was similar to that of wharfinger. And "[t]he law has long established that a wharfinger is required to exercise due diligence ... in removing any dangerous obstruction [from its berths] or warning any vessel using said facilities of its existence." *Pan American Grain Mfg. Co., Inc. v. Puerto Rico Ports Authority*, 295 F.3d 108, 115 (1st Cir.2002) (citing *Smith v. Burnett*, 173 U.S. 430, 435–36, 19 S.Ct. 442, 43 L.Ed. 756 (1899)). "This duty, however, only

---

**13.** I note that even if I believed that Shufflebotham misrepresented the condition of the ways to Karpinski, I would conclude that Weeks' operational negligence, and not Atkinson's failure to convey the correct dimension, caused the accident. For one, that Weeks was able to lift the first eight grids without a problem suggests that something other than the dimensions of the ways caused the October 11 accident. In addition, on October 11, Weeks' barge damaged the carriage on which the grid was sitting. Thus, the barge came far enough up the way that it would have damaged the ways regardless of whether there were eighteen inches (as Karpinski claims he believed) or forty-two inches (as was actually the case) between the grid and the end of the ways. In addition, Karpinski testified that on the day that Weeks arrived to lift the first grid, he marked the ends of the ways with antennae. If Karpinski marked the ways, he would have seen that there were not eighteen inches between the grid and antennae and would have had an obligation to raise and resolve the discrepancy between what he saw and what he claims Shufflebotham told him. That Karpinski said nothing suggests two things to me: (1) he was never promised that there would be eighteen inches and so was not surprised when he saw forty-two inches; or (2) Karpinski noticed the discrepancy and decided that Weeks could safely lift the grid anyway. Either way. Weeks' operational negligence, and not Karpinski's alleged misrepresentation, caused the October 11, 2000, accident.

extends to hidden hazards not reasonably known to the shipowner." *Id.*

23. Once Weeks knew about the existence and dimensions of the stops and bumpers, they were no longer "hidden hazards" and Reed & Reed therefore had no duty to remove them or warn Weeks about them.

24. Reed & Reed was not contributorily negligent.

### (D) Insurance Provisions in the Subcontracts

25. The subcontract between Callahan and Atkinson contains a waiver of subrogation provision.[14] It provides that, to the extent that a loss is covered by insurance, the parties release each other from liability and agree to look only to their insurers for reimbursement.

26. The subcontract between Reed & Reed and Callahan provides that "the general contract documents are incorporated ... with the same force and effect as if same were set forth at length herein; and that the subcontractor will be bound by any and all contract documents *insofar as they relate in any part or in any way, directly or indirectly, to the work covered by this agreement.*" (emphasis added). The subcontract between Reed & Reed and Callahan further provides that "[e]xcept as modified by this Subcontract, [Reed & Reed] agrees to adhere to and be bound to [Callahan] by all of the provisions of the General Contract and to the contract documents *affecting [Reed & Reed]'s work hereunder* ...." (emphasis added).

27. The term "general contract" in the subcontract between Reed & Reed and Callahan means the Atkinson/Callahan subcontract.[15]

28. Weeks argues that Reed & Reed is bound by the waiver of subrogation clause in the subcontract between Callahan and Atkinson by virtue of the "incorporation" provisions (quoted above) in the Reed & Reed/Callahan subcontract. The effect would be that Reed & Reed could not recover damages in this lawsuit because Reed & Reed's insurer, St. Paul, reimbursed Reed & Reed for its loss.

29. Weeks argues that the close corporate relationship between Reed & Reed and Callahan (*e.g.*, same owners, same administrative staff) show that Reed & Reed was familiar with the waiver of subrogation provision in the subcontract between Callahan and Atkinson. Weeks does not argue, however, that that close corporate relationship supports "piercing the corporate veil" and treating Callahan and Reed & Reed as one entity.

30. Both of the provisions in the Reed & Reed/Callahan subcontract that Weeks argues incorporate the waiver of subrogation provision purport to incorporate only

---

14. Although the waiver of subrogation provision is contained in an exhibit (Ex. E) and not in the body of the subcontract itself, I conclude that it is a part of the contract. The subcontract number appears on the top of each exhibit page and the exhibits set forth contractual obligations with which Callahan complied (providing insurance documents to Atkinson, for example). I conclude that the parties intended the exhibits to be a part of the subcontract.

15. The subcontract between Reed & Reed and Callahan defines "general contract" as "the agreement between [Callahan] and the Owner identified in the section of this Subcontract Agreement entitled 'Owner'...." The subcontract does not contain a section entitled "Owner." However, article 2(A) provides that "[Reed & Reed] shall be paid no more than [Callahan] is paid by the Owner for that particular division of work, or portion thereof, being done by [Reed & Reed]." Atkinson is the only entity with which Callahan had a contract. Atkinson is also the only entity that paid Callahan for its work. "Owner" in the Callahan/Reed & Reed subcontract therefore means Atkinson and "general contract" means the Atkinson / Callahan subcontract.

those provisions in the general contract (the subcontract between Callahan and Atkinson) that "relate" to or "affect" the work that Reed & Reed undertook in connection with its subcontract with Callahan.

31. By October 11, 2000, Reed & Reed had completed the ways and therefore completed the work covered by its subcontract with Callahan. Reed & Reed's claim in this lawsuit stems not from any injury it suffered as a subcontractor building the ways, but from an injury it suffered as property owner.[16]

32. If Reed & Reed waived its subrogation rights as property owner, that waiver would be contained in the Lease Agreement between Reed & Reed and Callahan.

33. The Lease Agreement between Callahan and Reed & Reed does not contain any waiver. Nor does the Lease Agreement refer to or incorporate any provisions from the subcontract between Atkinson and Callahan.[17]

34. Reed & Reed did not waive its right as a property owner to recover for damage negligently inflicted upon its property.[18]

*(E) Weeks' Counterclaim*

35. In its counterclaim, Weeks seeks delay damages. Weeks alleges that Reed & Reed's decision to halt lifting operations between October 12 and October 19, 2000, was unreasonable and calculated to force Weeks to accept responsibility for the accident.

36. I have found that Reed & Reed stopped launching grids because it was concerned that the damaged ways could no longer safely hold the weight of the 400–ton grids.

37. Weeks has presented no evidence that Reed & Reed's safety concerns were unreasonable or not the true reason for the delay.

38. I conclude that Reed & Reed's decision to stop launching grids from October 11, 2000, until October 19, 2000, was motivated by a reasonable concern about the structural integrity of the ways. Reed & Reed is not liable on the counterclaim.

### III. CONCLUSION

Weeks' negligent operation of its barge caused damage to Reed & Reed's

---

16. Reed & Reed happened to own the yard upon which it contracted to build the ways. Assume, however, that Callahan contracted with another entity to build the ways on Reed & Reed's yard and that that other entity agreed to waive its subrogation rights against fellow subcontractors. If Weeks negligently damaged the ways in this scenario, Reed & Reed would not be bound by the other subcontractor's waiver. The same is true given the facts of this case. The roles of subcontractor and property owner are not collapsible and what Reed & Reed waived in one capacity it did not waive in the other.

17. The subcontract between Callahan and Atkinson contains a clause requiring all contractors to include the insurance provisions in future subcontracts. Based on this contractual obligation, Weeks might fault Callahan for failing to include the waiver of subrogation provision in the lease agreement. Callahan, however, is no longer a party to this case and

Weeks cannot hold Reed & Reed to a contractual provision to which it did not agree to be bound.

18. Exhibit B of the Callahan/Atkinson subcontract, "Scope of Work," provides that Callahan will "fabricate the landing grids at *its* Woolwich, ME yard." (Emphasis added). Exhibit B further provides that the subcontract price includes "supplying the ... grids either FOB the yard's pier or FOB launched from the yard's ways." The Woolwich yard was not owned by Callahan, but by Reed & Reed. From the language used in the subcontract, however, it appears that Atkinson may have either misunderstood this fact or misunderstood that Reed & Reed and Callahan are distinct corporate entities. As I explained in text, however, Weeks has not pursued a veil piercing or alter ego theory in this case. Accordingly, I do not consider whether such a theory has merit.

property in the amount of $298,100. Weeks is not entitled to recover on its counterclaim. Nor is Weeks entitled to recover contribution from Atkinson. Weeks shall pay Reed & Reed $298,100.[19] The Clerk shall enter judgment in favor of the plaintiffs Reed & Reed, Inc. and St. Paul Fire & Marine Insurance Company in the amount of Two Hundred Ninety–Eight Thousand One Hundred Dollars ($298,100), plus interest and costs.

SO ORDERED.

19. At trial, I reserved ruling on two exhibits: Pls.' Ex. 53 (a letter from Traveler's insurance indicating that the Owner Controlled Insurance Program, offered by BIW for the benefit of all of the subcontractors, has denied the claim) and Def.'s Ex. 9 (an affidavit confirming that Atkinson paid Weeks in full and that Weeks signed a "final release and waiver of lien"). Neither of these exhibits is relevant to the issues in this case and I relied on neither of them in finding the facts or making conclusions of law. I also reserved ruling on two of Weeks' objections to designated deposition testimony of Herb Middleton. The first objection, to page 183, line 1 through 191, line 9, is MOOT. This deposition testimony is irrelevant given my conclusion in text that Weeks' counterclaim is without merit. The second objection, to page 206, lines 5 through 16 is SUSTAINED. The deponent clearly states on pages 146 and 147 that any knowledge he has of the use of the pike pole is second hand. His testimony on page 206 about the use of the pole and on-the-scene determinations made by Weeks' personnel therefore lacks foundation.